UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**05 CR 10111**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Criminal No. |
| ) | |
| v. ) | Violations: |
| ) | 33 U.S.C. §§ 1319(c)(1), 1321(b)(3) |
| ) | (Clean Water Act) |
| FRANKLIN ROBERT HILL, ) | 16 U.S.C. §§ 703, 707 |
| ) | (Migratory Bird Treaty Act) |
| Defendant. ) | |

## INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

### Background

1. At all times relevant to this Information, Bouchard Transportation Company, Inc. ("BTC") was a privately held, New York corporation with its principal place of business in Hicksville, New York.

2. At all times relevant to this Information, BTC was in the business of the marine transportation of oil and other types of petroleum products, primarily by means of tugboats and barges. BTC's operations were centered along the eastern seaboard of the United States and the Gulf of Mexico.

3. At all times relevant to this Information, the Defendant, FRANKLIN ROBERT HILL, was a resident of Jacksonville, Florida, and had been employed by BTC as a tugboat chief mate since August 2002.

4. On or about April 27, 2003, a tugboat owned and operated by BTC, named the *Evening Tide*, was traveling en route from Philadelphia, Pennsylvania to Sandwich, Massachusetts. The *Evening Tide* departed from Philadelphia on April 24, 2003.

5.      During this trip, the *Evening Tide* was hauling a barge named the Bouchard *B-120* (the "*B-120*") to the Mirant Canal Generating Plant located on the Cape Cod Canal in Sandwich. The *B-120*, built in 1975, is a single-hull vessel that weighs 7,912 gross tons and is 376 feet long. The *B-120* is comprised of ten separate tanks, five on the port side and five on the starboard side of the vessel.

6.      The *B-120* is an unpowered barge and it can only be moved with the assistance of a tugboat. The primary means by which a tugboat, such as the *Evening Tide*, moves the *B-120* is either by towing it, using one of the two steel cables that extend off the stern of the tugboat, or by pushing the barge. The *B-120* has a large, triangular shaped notch in her stern, which a tugboat like the *Evening Tide* can slip into in order to push the barge.

7.      On April 27, 2003, the *B-120* was loaded with approximately 99,000 barrels of #6 oil, also known as Bunker C fuel. Number 6 oil is a thick, viscous and adhesive petroleum product that is used primarily by power plants. Measured in gallons, the *B-120* was carrying approximately 4.1 million gallons of # 6 oil as it traveled through Buzzards Bay on April 27, 2003. With a load of this size, the draft of the *B-120* (*i.e.* the depth to which the barge extended into the water) was approximately 25 feet, six inches.

8.      For this voyage from Philadelphia to Sandwich, the *Evening Tide* had a crew of six individuals, comprised of a captain, a mate, two deck hands, a chief engineer and an assistant engineer. The defendant was the mate on the voyage, having been assigned to the *Evening Tide* in February 2003.

9.      The crew worked in six hour shifts, with each shift consisting of either the captain or the mate, one deck hand and one of the engineers. The unpowered *B-120* was manned by a

two-person crew, a captain and a mate, who worked in six hour shifts. As a general matter, the crew of the *Evening Tide* worked on the boat for three weeks at a time, followed by three weeks off.

10. The duties of the mate are to be in charge of all aspects of the tugboat operations during the twelve hours each day when the mate is on-duty and the captain is off-duty. According to Bouchard's Responsible Carrier Plan, when on duty the mate is responsible for, among other things, "navigat[ing] the vessel in a safe and prudent manner . . . complying with all applicable U.S. Coast Guard Inland Navigation Rules." According to the Plan, the mate must also "observ[e] [BTC's] look-out policy," by maintaining a "proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and the risk of collision." According to the Plan, the mate is also responsible for maintaining radio communications with other vessels during his watch.

11. The duties of the mate were also set forth in the *Evening Tide*'s "Watch Standing Orders," a BTC document issued by *Evening Tide* captain Jon Richardson in January 2001. Among other things, these standing orders, a copy of which were kept in the *Evening Tide's* wheelhouse, stated that the mate or captain shall "never leave the bridge UN-attended (sic) while underway or at anchor unless properly relieved."

12. The duties described in both the Responsible Carrier Plan and Richardson's Watch Standing Orders were consistent with applicable Coast Guard regulations. These regulations include Rule 5 of the Coast Guard Navigational Rules:

Every vessel shall at all times maintain a proper look-out by sight and hearing as well as

by all available means appropriate in the prevailing circumstances and conditions so as to make full appraisal of the situation and of the risk of collision.

Coast Guard regulations also require that towing vessels "maintain a continuous listening watch on the designated calling channel."

13.  At the stern of the tug is a second set of navigational controls, called the aft controls, which enable the mariner to maneuver the vessel while operating the cable winch. From the aft controls, the mariner's view of what is in front of the vessel is obstructed by the wheelhouse. For that reason, when operating the tug from the aft controls, a prudent mariner would post another crew member as a look out in the wheelhouse or on the bow to ensure that the vessel continues on its heading and is not nearing any other object.

14.  The Defendant was initially assigned to the informal mate training program at Bouchard for a few weeks, in which he served alongside an experienced captain as an extra person during the captain's shift. The Defendant was then promoted out of the training program to be a full mate aboard two other BTC tugboats -- the *Ellen Bouchard* and then the *J. George Betz* -- prior to being assigned to the *Evening Tide*. The Defendant possessed all of the licenses, certifications and training required by the Coast Guard to serve as a tugboat mate.

## The Clean Water Act and the Oil Pollution Act

15. In the Federal Water Pollution Control Act (the "Clean Water Act"), as amended by the Oil Pollution Act, 33 U.S.C. §1321(b)(1), Congress has declared that it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States or the adjoining shorelines.

16. The Clean Water Act makes it a crime for a person to negligently discharge oil into or upon the navigable waters or contiguous zone of the United States, in such quantities as may be harmful. 33 U.S.C. §§1321(b)(3) and 1319(c)(1).

17. The Clean Water Act defines a "discharge" as any spilling, leaking, pumping, pouring, emitting, emptying or dumping. 33 U.S.C. §1321(a)(2). The Clean Water Act defines "oil" as oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge and oil refuse. 33 U.S.C. §1321(a)(1).

18. Federal regulations promulgated under the Clean Water Act define a "harmful" quantity of oil as including any discharges of oil that cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or adjoining shorelines. 40 C.F.R. §110.3.

19. The Clean Water Act defines the "navigable waters" of the United States as the waters of the United States and the territorial seas, which are defined to be water extending three (3) miles seaward of the low tide mark. 33 U.S.C. §§ 1362(7) and 1362(8).

## The Oil Spill

20.  The weather on the afternoon of April 27, 2003 was bright and clear, with winds at 10-15 knots out of the North. The sea swells that day were running three to five feet in a southwesterly direction. All the navigational, communications, mechanical and steering equipment systems aboard the *Evening Tide* were in good working order throughout that day.

21.  On April 27, 2003, the defendant was in charge of the vessel during the noon to 6:00 P.M. shift. The *Evening Tide* Captain was off-duty for that shift, having been on duty for the 6:00 A.M. to noon shift.

22.  In the late-afternoon, the *Evening Tide* approached the entrance to Buzzards Bay Channel, as delineated by the first of a series of red and green navigational buoys which clearly mark the channel. The first navigational buoy a ship encounters as it enters the Buzzards Bay Channel from the south is a green navigational buoy located at 41-25-48 degrees North and 071-02-18 degrees West (hereinafter "the First Buzzards Bay Buoy"). The opening of the channel is approximately a mile wide.

23.  All of these navigational buoys, as well as the hazards in Buzzards Bay and the depths of the various rocky shoals in this area, are clearly marked on the widely used navigational charts published by the National Oceanic and Atmospheric Administration ("NOAA"). These NOAA charts for Buzzards Bay were on-board the *Evening Tide* on April 27, 2003, both in paper form and on the navigational software installed on the ship's computer.

24.  As the *Evening Tide* was approaching the entrance to Buzzards Bay Channel it was towing the *B-120*, using the steel cable off the stern of the *Evening Tide*, which was connected to a cable wire off the bow of the *B-120*. At this time, the length of the tow wire

connecting the *Evening Tide* to the *B-120* was approximately 1,200 feet.

25.  Prior to the noon to 6:00 P.M. shift, the captain instructed the Defendant not to adjust the tow cable until the vessel was nearing the Cape Cod Canal.

26.  During the approach to the first channel buoy, the Defendant left the wheelhouse and proceeded to the stern of the *Evening Tide* to pull in the tow wire.

27.  During this period, there was no one in the wheelhouse of the *Evening Tide*. The Defendant remained at the stern of *Evening Tide* for approximately fifteen minutes. At no point did he seek assistance from other crew members to serve as a look out to ensure that the vessel stayed on course. The Defendant also knew that he had left his hand-held radio in the wheelhouse, so he was not able to communicate with other vessels in the area while he was at the stern. It was during this period that the Defendant lost his awareness of the vessel's heading.

28.  The Defendant's conduct, in failing to assign a crew member to relieve him in the wheelhouse and to monitor the radio, violated the Responsible Carrier Plan, Richardson's Watch Standing Orders, applicable Coast Guard regulations, and industry standards.

29.  A second tug boat, the *Carl Ray*, which is owned and operated by a different company, was also traveling northeast towards Buzzards Bay Channel on the afternoon of April 27, 2003. Like the *Evening Tide*, the *Carl Ray* was towing a barge loaded with oil. The *Carl Ray* was approximately two nautical miles behind the *Evening Tide*.

30.  Prior to reaching the entrance to Buzzards Bay Channel, at approximately 4:10 p.m., the mate on the *Carl Ray* attempted to contact the *Evening Tide* several times. After initially not receiving a response, he spoke with the Defendant and stated that the *Carl Ray* would be slowing down to shorten its tow wire.

31. Shortly thereafter, the captain of the *Carl Ray*, who joined his mate in the wheelhouse of the *Carl Ray*, observed the route the *Evening Tide* was traveling as it approached the First Buzzards Bay Buoy. The captain of the *Carl Ray* initiated radio contact with the *Evening Tide* because the *Evening Tide* was approaching the Buzzards Bay Channel at the extreme left-hand side of the channel instead of heading for the center of the channel, as is customary. The captain of the *Carl Ray* was concerned that the *Evening Tide* was approaching more shallow areas of Buzzards Bay, punctuated by several reefs, which exist just outside the marked channel. Immediately to the northwest of the First Buzzards Bay Buoy is an area of several rocky reefs that lie 22 feet below the surface. By contrast, the depths within the marked Buzzards Bay Channel range between 42 and 63 feet.

32. Because the Defendant did not take his radio with him and had failed otherwise to maintain radio communications, the captain of the *Carl Ray*, despite efforts to reach the *Evening Tide* over the radio for several minutes, was unable to warn anyone on the *Evening Tide*.

33. After he returned to the wheelhouse, the Defendant initiated a radio call to the *Carl Ray* in which the Defendant stated that he was having difficulty bringing in his tow wire. The captain of the *Carl Ray* asked the defendant if he was where he wanted to be in the channel, in reference to the highly unorthodox approach the *Evening Tide* was taking. The *Carl Ray* received a garbled response.

34. After this brief exchange between the *Carl Ray* and the Defendant, the *Evening Tide* and the *B-120* passed the First Buzzards Bay Buoy on the wrong side; that is, outside the clearly-marked channel. As direct result of the Defendant's negligent failure to notify the captain, to post a look out, to maintain radio contact, and to remain generally aware of the

situation, the *Evening Tide* and *B-120* were approximately a quarter-mile on the wrong side of the First Buzzards Bay Buoy.

35. The *B-120* struck a rock outcropping to the northwest of the First Buzzards Bay Buoy as it traveled outside Buzzards Bay Channel. This reef is marked on the NOAA navigational charts as being at a depth of 22 feet.

36. At the time of the accident, the *Evening Tide* and the *B-120* were traveling at a speed of approximately 6 knots. The impact of the barge striking the rocks at this location ripped a twelve-foot long gash slightly to the starboard side of the keel line on the bottom of the *B-120*. The hole in the bottom of the barge, which was constructed of thick steel, was as wide as one foot at certain points and up to twenty-one inches deep. The damage caused by this collision with the reef was limited to the #2 tank on the starboard side of the *B-120*.

## The Impact of the Oil Spill

37. As a result of this collision with the reef, approximately 98,000 gallons of #6 oil was released into Buzzards Bay from the gaping hole in the *B-120*.

38. The discharge of this heavy, sticky oil was especially harmful to the fragile bird population in this area. More than 450 federally-protected birds were recovered dead after coming into contact with the #6 oil discharged from the *B-120*. An untold number of others were washed out to sea. More than half of the birds killed were Common Loons, Red Throated Loons, Common Eiders or Black Scoters. Oil from this spill also caused the death of a wide variety of other protected birds, including Black Backed Gulls, Dunlins, Herring Gulls, Long-tailed Ducks, Black Ducks, Buffleheads, Canada Geese, Common Terns, Gannets, Greater Scaups, Mergansers, Grebes, Swans, Razorbills, Scoters, Willets and Yellowlegs. Only a small number of birds that came into contact with the #6 oil from this spill were rehabilitated and returned to the wild.

39. The oil spill also caused the immediate closure of thousands of acres of shellfish beds in Buzzards Bay, a large portion of which remained closed for several months following the oil spill. Oil from the *B-120* soiled over ninety miles of Massachusetts beaches and coastline. The total cost of cleaning up this oil spill is still being determined and it is expected to run into the tens of millions of dollars. The long-term impact from the release of this oil into the water, in terms of marine life, the bird population and the overall ecology of Buzzards Bay will not be known for several years.

## COUNT ONE -- 33 U.S.C. §§ 1319(c)(1), 1321(b)(3)
### (Clean Water Act -- Negligent Discharge of Pollutant)

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

40. Paragraphs 1-39 are realleged and incorporated by reference as though fully set forth herein.

41. On or about April 27, 2003 in Buzzards Bay, in the District of Massachusetts and elsewhere, the defendant,

### FRANKLIN ROBERT HILL

negligently caused the discharge of a harmful quantity of oil from the barge, the Bouchard *B-120*, into and upon the navigable waters of the United States.

All in violation of Title 33 U.S.C. §§1319(c)(1) and 1321(b)(3).

## COUNT TWO- 16 U.S.C. §§ 703 and 707(a)
### (Migratory Bird Treaty Act)

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

42. Paragraphs 1-39 are realleged and incorporated by reference as though fully set forth herein.

43. On or about April 27, 2003 in Buzzards Bay, in the District of Massachusetts and elsewhere, the defendant,

### FRANKLIN ROBERT HILL

without being permitted to do so by regulation as required by law, did cause the death of migratory non-game birds.

All in violation of the Migratory Bird Treaty Act, Title 16, U.S.C. §§ 703 and 707(a) and Title 50, *Code of Federal Regulations*, §21.11.

MICHAEL J. SULLIVAN
United States Attorney

By: /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
Assistant U.S. Attorney

PETER KENYON
Senior Criminal Enforcement Counsel
Environmental Protection Agency

COMMANDER STEVEN STANCLIFF
First District Legal Officer
United States Coast Guard

Dated: April 26, 2005

✎JS 45 (5/97) - (Revised USAO MA 6/29/04)    05 CR 10111

| Criminal Case Cover Sheet | U.S. District Court - District of Massachusetts |

Place of Offense: Buzzard Bay     Category No. I     Investigating Agency EPA/COAST G/F&W

City     Westport     Related Case Information:

County    Bristol

Superseding Ind./ Inf. _____  Case No. _____
Same Defendant _____  New Defendant _____
Magistrate Judge Case Number _____
Search Warrant Case Number _____
R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name    Franklin Robert Hill         Juvenile  ☐ Yes  ☒ No

Alias Name _____

Address    3965 Bess Road, Jacksonville, FL 32277

Birth date (Year only): 1951  SSN (last 4 #): 2627  Sex M  Race: White  Nationality: US

Defense Counsel if known:  Peter Ball       Address: Sally & Fitch
                                                      225 Franklin St., Boston, MA 02110
Bar Number: _____

**U.S. Attorney Information:**

AUSA    Jonathan Mitchell         Bar Number if applicable 629499

Interpreter:  ☐ Yes  ☒ No     List language and/or dialect: _____

Matter to be SEALED:  ☐ Yes  ☒ No

☐ Warrant Requested     ☒ Regular Process     ☐ In Custody

**Location Status:**

Arrest Date: _____

☐ Already in Federal Custody as _____ in _____
☐ Already in State Custody _____  ☐ Serving Sentence  ☐ Awaiting Trial
☐ On Pretrial Release:  Ordered by _____  on _____

Charging Document:  ☐ Complaint    ☒ Information    ☐ Indictment

Total # of Counts:  ☐ Petty ____  ☒ Misdemeanor 2  ☐ Felony ____

Continue on Page 2 for Entry of U.S.C. Citations

☒ I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.

Date: 4/26/05     Signature of AUSA: _____

JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

District Court Case Number  (To be filled in by deputy clerk): _____

Name of Defendant    Franklin Robert Hill

U.S.C. Citations

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| Set 1  33 U.S.C. §§ 1319(c)(1), | Clean Water Act | 1 |
| Set 2  and 1321(b)(3) | | |
| Set 3  16 U.S.C. §§ 703 and 707 | Migratory Bird Treaty Act | 2 |
| Set 4 | | |
| Set 5 | | |
| Set 6 | | |
| Set 7 | | |
| Set 8 | | |
| Set 9 | | |
| Set 10 | | |
| Set 11 | | |
| Set 12 | | |
| Set 13 | | |
| Set 14 | | |
| Set 15 | | |

ADDITIONAL INFORMATION: