UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   Criminal No. 05-10111-RBC |
| | ) |
| FRANKLIN ROBERT HILL, | ) |
| | ) |
| Defendant. | ) |

## GOVERNMENT'S SENTENCING MEMORANDUM

The Buzzards Bay Oil Spill devastated the Southeastern Massachusetts shoreline, causing widespread damage to the region's fragile ecosystem and millions of dollars in losses to the local economy. The defendant, Franklin Robert Hill, caused the spill by allowing his tug boat and the oil barge it was towing to veer out of the Buzzards Bay Channel where it collided with a large rock outcropping. The defendant is not guilty of a mere slip-up, an otherwise innocuous mistake, like that in the famous Palsgraf case, that yielded unforeseeably grave damage. Rather, he made a series of compounding lapses in judgment, that produced a disaster that, as widespread as it was, could have been far worse.

The defendant, who faces a guideline sentencing range of 10-16 months, should receive a sentence of five months incarceration (the minimum period of incarceration for a Zone C sentence in this range). The magnitude of the damage, the degree of carelessness on the part the defendant, his inability to accept responsibility for the offense, and the imperative of deterring similar conduct in the future so as avoid similar, or even worse spills, together demand that the defendant serve a period of incarceration.

I.  **THE IMPACT OF THE SPILL**

On the afternoon of April 27, 2003, a Bouchard Transportation Company barge dubbed the *B-120*, which was towed by the Bouchard tug boat, *Evening Tide*, struck a rock outcropping to the northwest of the First Buzzards Bay Buoy, having veered outside Buzzards Bay Channel. See Exhibit 1.[1]  The vessel was carrying approximately 4.1 million gallons of No. 6 heating oil from Philadelphia to the Mirant Canal Generating Plant on the Cape Cod Canal.  The impact of the barge striking the rocks ripped a twelve-foot long gash slightly to the starboard side of the bottom of the vessel.  The hole in the hull, which was constructed of thick steel, was as wide as one foot and up to twenty-one inches deep.  The damage caused by this collision with the reef was limited to the No. 2 tank, one of ten tanks in all.  As a result of the collision, tens of thousands of gallons of the No. 6 oil, a thick, viscous oil used in power plants, were released into Buzzards Bay, a spill that eventually grew to 98,000 gallons.

Although the defendant attempts to minimize the impact of the spill by stating merely that it "caused the death of certain migratory birds," see Def. Sent. Mem. at 5, and emphasizing that no one was killed, see id. at 13, the impact of the spill was enormous.  It devastated the fragile bird population on the Southeastern Massachusetts coast.  Within weeks of the spill, 478 federally-protected birds were recovered dead from the spill.  According to the U.S. Fish and Wildlife Service, a far greater number likely perished and sank at sea.  More than half of the

---

[1] Exhibit 1 is a map of Buzzards Bay.  The red cross indicates approximately where the B-120 collided with the rock.  The inset nautical chart depicts the area.  The First Buzzards Bay Buoy, which is just south of the rock, is depicted in green in the lower left side of the inset.  The collision took place where the map indicates a water depth of 22 feet.

recovered dead birds were Common Loons, Red Throated Loons, Common Eiders or Black Scoters. Oil from this spill also caused the death of a wide variety of other protected birds, including Black Backed Gulls, Dunlins, Herring Gulls, Long-tailed Ducks, Black Ducks, Buffleheads, Canada Geese, Common Terns, Gannets, Greater Scaups, Mergansers, Grebes, Swans, Razorbills, Scoters, Willets and Yellowlegs. Only a small number of birds that came into contact with the No. 6 oil from the spill were rehabilitated and returned to the wild.

The spill also forced the immediate closure of thousands of acres of shellfish beds in Buzzards Bay, some of which remain closed even today. As depicted on the map attached as Exhibit 1, oil from the *B-120* soiled nearly ninety miles of Southeastern Massachusetts beaches and coastline, affecting a variety of local businesses that depend on beach traffic. The spill also consumed thousands of hours of volunteers from across the region, who worked feverishly to clean beaches and treat wildlife exposed to the oil.

According to the Coast Guard, all told the clean-up of the spill cost approximately $38 million. According to the Department of the Interior, which is conducting the Natural Resource Damage Assessment of the spill, an estimate of the dollar value of the environmental damage is more than a year away. By way of comparison, the environmental damage caused by the 1999 Ecklof Spill in Narragansett Bay totaled $16 million. The Buzzards Bay Spill was much worse, covering more shore line and killing more birds and marine animals. Thus, it is fair to say that the Buzzards Bay Spill resulted in more than $50 million in clean-up costs and damages.

What is most remarkable about the Buzzards Bay Spill, however, is how much worse it easily could have been. Although the barge passed directly over the rock outcropping, luckily only one of the barge's ten tanks was punctured. The widespread damaged was caused by the

98,000 gallons of No. 6 oil that leaked from the tank, representing just two percent of the total volume on board. If the vessel had struck the reef at a slightly different angle, or had hit other rocks that were close-by (see Exhibit 1), a far larger spill might have occurred. Sheer luck prevented what might have been an environmental catastrophe.

## II.     THE DEFENDANT'S GROSS NEGLIGENCE CAUSED THE SPILL.

At the time of the spill, the defendant was at the helm of the *Evening Tide*, and was alone responsible for its navigation. As the vessels approached the entrance to the channel, the defendant made not one, but a series of avoidable lapses in judgment that allowed the vessels to veer off course.

April 27, 2003 was a clear, calm day on Buzzards Bay. The entrance to the channel was clearly marked by the so-called First Buzzards Bay Buoy. Maritime traffic was light. There were no mechanical problems with the *Evening Tide*. The vessel was equipped with standard navigational and communication equipment, including up-to-date maps and operating radios. The rocks the *B-120* ultimately struck were clearly marked on both the vessel's electronic and paper charts. The channel itself is nearly a mile-wide at its opening and, is routinely traversed at night and in foul weather.

Despite these ideal conditions, evidence gathered by the government reveals that the defendant made several critical errors in judgment that caused the tug and barge to veer outside the clearly marked shipping channel. First, as the tug approached the entrance to Buzzards Bay, the defendant decided to pull in the tow wire, a step that required him to attend to the tow winch

at the stern of the vessel, while piloting the vessel from the rear-facing, aft controls.[2] According to the several captains the government interviewed, because the view of the front of the vessel is obstructed by the pilot house, a reasonable seaman would not remain long at the aft controls, if at all, and in any case would post another crew member to serve as a forward lookout. The defendant took neither of these precautions. The evidence suggests that he spent approximately fifteen minutes at the aft controls while the vessels continued to approach the entrance to Buzzards Bay.[3] Moreover, there was no crisis that warranted his remaining at the aft controls. Inexplicably, he neglected to summon any of the other crew members to watch where the vessel was heading. It was during this time that the vessel began to veer out of the shipping channel. Simply put, the defendant had completely lost sense of where the vessel was going.

Despite these mistakes, the defendant still could have averted the impending disaster had he maintained constant internal and external radio contact, as is required of someone in his position. The defendant left his hand-held radio in the pilot house while he fiddled with the tow line. Had he brought his radio with him, he would have received warning calls from the crew of the *Carl Ray*, a nearby tug whose crew was witnessing the *Evening Tide* veer off course. At no time, moreover, did the defendant avail himself of the ultimate safety measure as he was attempting to bring in the tow, namely to call the captain for help. In short, the defendant failed

---

[2] A shorter tow, general speaking, increases a tug's control of a barge and is advantageous closer to land where sea lanes are tighter; whereas, a longer tow is useful in open ocean water, where rolling seas call for more slack.

[3] The likely reason why the defendant spent so long at the aft controls was on account of the damage he had done to the other winch the day before. See Gov't Opp. to Mot. for Downward Departure at 4.

to appreciate the situation at hand until it was too late.

The defendant's failures in judgment amount to more than simple negligence. He was responsible for transporting an enormous volume of hazardous cargo through a sensitive coastal ecosystem – <u>a circumstance that demanded heightened vigilance</u>. On the day of the spill, the tug and barge were functioning properly, the weather was ideal, and the channel was clearly marked. Vessels of all sizes routinely traverse the channel at night and in foul weather without incident. The defendant himself had all the requisite licenses and certifications to do his job. Nevertheless, the defendant failed to exercise a modicum of common sense, much less employ the knowledge of the trained mariner that he was, in navigating the *Evening Tide* through Buzzards Bay on April 27, 2003. He left the pilot house for an inordinate amount of time; he neglected to post a look out; he missed warning calls because he left his radio behind in the pilot house; he failed to summon the captain; and, above all, he lost entirely his awareness of the vessel's heading. What caused the spill was not an otherwise innocuous mistake, but rather a series of compounding, readily avoidable failures in judgment that led to a foreseeable outcome. The defendant was downright careless under circumstances that demanded extreme caution.

### III. THE DEFENDANT HAS NOT ACCEPTED RESPONSIBILITY.

What is abundantly clear from the defendant's Sentencing Memorandum is that despite his repeated claims that he accepts responsibility for the spill, see e.g. Def. Sent. Mem. at 4, he has not. He continues to shift the blame for the spill to others.

For starters, nowhere in his sentencing memorandum does he explain what actions he took and failed to take leading up to the collision. Instead, he states that he does not agree with the government's version of what took place. Id. True contrition consists not only of

acknowledging responsibility, but admitting one's actions. This principle is codified in the Sentencing Guidelines. See U.S. Sentencing Guidelines, § 3E1.1, Application Note 1(a) (explaining that a finding of acceptance of responsibility under the guidelines requires "truthfully admitting the conduct comprising the offense(s) of conviction"). The defendant has failed in this way. Whatever the defendant's version of events, there is no dispute over certain facts:

- The defendant was alone in the wheelhouse at the time of the collision;

- At that time, the defendant alone was responsible for the operation of the vessel;

- The defendant had all of the requisite training and certifications to perform his job;

- All of the vessel's navigation systems were working;

- It was a crystal clear April day with light seas;

- The defendant had available to him current ocean charts that depicted clearly the hazards in Buzzards Bay, including the rock outcropping he ultimately struck;

- The buoys marking the entrance to the channel were visible with the naked eye;

- A nearby tug transmitted several warning calls to the Evening Tide as it drifted perilously close to the edge of the channel;

- There was no crisis or emergency that required him to be away from the pilot house;

- The Evening Tide passed out of the channel at a marked point; that is, it passed right by a channel buoy, as opposed to drifting out of unmarked area of the channel; and

- Assistance from other crew members was available.

Given these facts, the defendant cannot blame anyone but himself for the spill.

But he still does. He first contends that he is only partly blameworthy because his former

employer, Bouchard Transportation, contributed to the accident. In support of this contention, he quotes the government's press release from the Bouchard prosecution, that Bouchard "pled guilty to having 'various operational deficiencies pertinent to the oil spill.'" Def. Sent. Mem. at 5. Inasmuch as this argument attempts to shift blame, it inaccurately portrays the basis of the corporation's liability in this case. The government proceeded against the corporation on two theories of liability: that the corporation was vicariously liable for the acts of its employee, namely Hill; and that the corporation was directly liable for the spill because it should have known that having Hill, who had been involved in other acts of gross negligence,[4] at the helm of a tug boat created an unacceptable risk of an accident. See Superceding Indictment, United States v. Bouchard Transportation Company, Inc., CR.-04-10087-MBB, ¶¶ 15-19, attached hereto as Exhibit 2.[5] In other words, the corporation was not alleged to be liable because it somehow facilitated the conduct that gave rise to the spill, rather, it negligently failed to stop Hill, who had proven himself to be an accident waiting to happen. Thus, the defendant, who was fully trained and experienced, as he contends throughout his Sentencing Memorandum, is effectively saying, "the corporation should have stopped me before I did some real damage." This is a complete abdication of responsibility on his part.

The defendant also attempts to blame the spill on the captain of the vessel, who was off-duty at the time of the collision. The defendant contends that "the captain plotted a bad 'track

---

[4] See Government's Opposition to Defendant Motion for Downward Departure at 4.

[5] In fact, Bouchard was unwilling to accept liability on the second ground because it contended it was not on notice of the risk that Hill posed.

line' for the voyage, one which had the tug and barge approaching the channel in Buzzards Bay from the wrong angle and would have resulted in the barge literally being towed over the first buoy marking the entrance to the channel." See Def. Mem. at 5. As the defendant well knows, the government has thoroughly investigated whether others may have been negligent in causing the spill, and it concluded that no other charges were warranted. More to the point, it made no difference what track the vessel was "on." The vessel was not operating on auto-pilot. The defendant was responsible for navigating the vessel, using his training and experience, as well as the navigational aids at his disposal. The track line itself is merely an aid to navigation; it is not a substitute for the judgment of the person at the helm. If the track line passed near or over the first buoy, a modicum of common sense would have told the defendant to steer clear of it. That he now contends otherwise is entirely self-serving, and reflects that he truly is not sorry for his actions.

## IV. CONGRESS INTENDED THAT CONDUCT LIKE THE DEFENDANT'S BE PUNISHED WITH JAIL.

Punishing marine operators with jail time for negligently causing large oil spills was precisely what Congress had in mind when it enacted the Oil Pollution of Act of 1990 ("OPA"). OPA was a direct response to the 1989 Exxon Valdez oil spill – the worst maritime environmental disaster in U.S. history. The public outrage that accompanied that spill spurred Congress to resolve fifteen years of political and policy differences and pass a statute designed to prevent future oil spill catastrophes. Among the main elements of the Oil Pollution Act were tougher criminal penalties. In particular, Section 4301 of the Act amended the Clean Water Act

to authorize prison terms and criminal fines for both knowing <u>and</u> negligent oil spills.[6] Pub. L. 101 - 380, tit. IV, § 4301, 104 Stat. 484 (1990). Had Congress wanted to impose jail time only for knowing violations, it would have amended only the felony provisions found in Section 309(c)(2) of the Clean Water Act, 33 U.S.C. §1319(c)(2). Instead, Congress amended both Section 309(c)(1) and 309(c)(2), 33 U.S.C. §1319(c)(1) and §1319(c)(2), thereby making negligent spills punishable with prison sentences of up to 1 year. <u>See</u> Conference Report, House Report No. 101-653 (August 1, 1990), Joint Explanatory Statement of the Committee of Conference at p.155 .[7]

Congress' unambiguous desire that criminal penalties, including imprisonment, be imposed for oil spills was underscored by Senator Lieberman during the senate adoption of the Conference Report. Senator Lieberman said,

> I am particularly pleased that the legislation assures that those who are responsible for damaging our fragile environment will be subject to substantial civil and criminal penalties in addition to responsibility for cleanup costs. . . .

---

[6] In pertinent part, Section 4301 reads as follows:

(c) CRIMINAL PENALTIES. - Section 309(c) of the Federal Water Pollution Control Act (33 U.S.C. 1319(c)) is amended by inserting after "308," each place it appears the following: "311(b)(3),".

[7] The Joint Explanatory Statement reads,

Section 4301(c) of the Conference substitute provides that violations of the prohibition on discharges of oil or hazardous substances are subject to criminal penalties established under section 309(c) of the Federal Water Pollution Control Act. These penalties are $2,500-$25,000/one year in prison for negligent violations, $5,000-$50,000/three years for knowing violations, and up to $250,000 and 15 years for knowing endangerment.

> It was my intent in writing the penalty provisions of my legislation, which have been substantially adopted in this bill that, in the event of a spill, the Government apply the penalty provisions in a manner which will punish the violator and deter and prevent future violations. . . . In enforcing these provisions, the Government should also bear in mind that law enforcement officials, including the Attorney General of the United States, have recently emphasized that criminal enforcement is a particularly effective tool in securing compliance with our environmental laws; this special deterrent effect should be strongly considered in those cases where the Government may have discretion to apply civil or criminal penalties.

136 Cong. Rec. S11536 - S11548 (August 2, 1990) (statement of Senator Lieberman).

For marine operators of large vessels who negligently cause oil spills, to claim that negligence is somehow a mitigating circumstance warranting lesser punishment runs contrary to Congress' intent. Congress was well aware that large oil tanker collision-spills, like the one in this and the Exxon-Valdez cases, are invariably negligence cases. No one would expect after all that an oil tanker would be intentionally crashed. The defendant's situation is no different from what Congress had in mind; that is, to avoid major oil spills, courts ought to impose jail time on negligent vessel operators. Congress also was aware that operators would be subject to the loss of their licences and livelihood, and still concluded that the possibility of such collateral consequence was inadequate to deter negligent conduct.

Indeed, courts around the country repeatedly have imposed jail time on less culpable defendants who caused less damaging spills. In United States v. Hanousek, 176 F.3d 1116 (9th Cir. 1999), the defendant was a supervisor on a work site on an Alaskan railroad, which ran parallel to, and just feet from, a heating oil pipeline. Id. at 1120. The defendant's crew had protected the pipeline near the site with railroad ties and sand. Id. One of the defendant's underlings, without the defendant's knowledge, used a back hoe to remove boulders from the track near an unprotected area of the pipeline. Id. As he was sweeping the rocks away, he

punctured a hole in the pipeline, and between 1,000 and 5,000 gallons of heating oil spilled into a nearby river. Id. Although the defendant was negligent insofar as he did not take the appropriate precautions to prevent the spill (as opposed to being directly negligent like the backhoe driver), the court denied the defendant's motion to depart based on Application Note 3. Id. at 1125. With a total offense level of 12 and a Criminal History Category of I, the defendant was sentenced to six months incarceration, followed by six months in a halfway house. Id. Although the defendant dismisses this case as "stand[ing] for nothing except the unremarkable proposition that the Court of Appeals lacks jurisdiction to review the district's refusal to depart downward from the Guidelines," see Def. Sent. Mem. at 14, the case is an unmistakable example of a defendant sentenced to jail time for conduct and damage not nearly as serious as that in this case.

There are other examples of defendants receiving jail time in cases involving other Clean Water Act provisions:

In United States v. Fitzpatrick, 1997 U.S. App. Lexis 28743 (4th Cir. 1997), the defendant stole electrical breakers which caused a West Virginia POTW to become inoperable and discharge 12 million gallons of raw sewage into the Guyandotte River. Fitzpatrick pleaded guilty to negligently causing the Pea Ridge Public Service District to violate its NPDES permit. He also pleaded guilty to a separate information charging him with interstate transportation of stolen property. The court imposed a sentence of 36 months for the combined offenses, and ruled that the pollution offense carried a sentence of 27 months. The court refused to depart downward on the grounds that the defendant acted negligently rather than knowingly.

In United States v. Hong, 242 F.3d 528 (4th Cir. 2001), the defendant was convicted of 13 misdemeanor violations of the CWA for discharging untreated wastewater into the Richmond,

Virginia sewer system. Although the court departed downward 2 levels for negligence, Hong was sentenced to <u>36 months imprisonment</u> and a $1.3 million fine.

In <u>United States v. William Lee Slocum</u>, No. CR 99-26E (W.D. Penn. 2000), the defendant pled guilty to six counts of negligently violating the CWA at the Youngsville Sewage Treatment Plant between 1983 and 1995. During his tenure he caused the discharge of approximately 3.5 million gallons of raw sewage and sludge into Brokenstraw Creek, which is a tributary of the Allegheny River. On May 9, 2000, he was sentenced to serve <u>one month imprisonment</u> followed by one year of supervised release, the first five months of which are to be served on house arrest. He was additionally ordered to pay a $15,000 fine.

This case is exactly what Congress had in mind when it passed the OPA penalty provisions. In so doing, Congress rejected the notion, advanced by the defendant, that "negligence is largely undeterrable, it is largely impractical to try to deter it with the threat of criminal sanctions." <u>See</u> Def. Sent. Mem. at 11. Not only does this statement fly in the face of common sense (think about what the roads would be like in the absence of the threat of tort suits), it is belied by the steep decline in oil spills since the passage of OPA. According to data compiled by the United States Coast Guard, since the enactment of the Oil Pollution Act in August of 1990, the incidence of large spills has fallen dramatically. From 1991 through 2000, there were no oil spills of 1,000,000 gallons or more; in the preceding decade there were fifteen. From 1991 through 2000 there were twenty-five spills between 100,000 and 1,000,000 gallons (the spill in this case was just under 100,000 gallons); in the preceding decade there were 91. <u>See</u> www.uscg.mil.

## V.   CONCLUSION

Underlying the idea that the threat of jail time is required to deter spills like the Buzzards Bay Spill is the old adage that discretion cannot be eliminated, it can only be diffused. No matter how strict of a compliance system, the individuals through whom modern corporations act must take responsibility for their actions. For some, such as the pilot, the mariner, the truck driver, and the food inspector, heightened care is the difference between safe operation and catastrophe. In the case of the marine transportation of oil, Congress has seen fit to secure such care through the threat of incarceration. Because the defendant failed to exercise not just reasonable care, but common sense, in transporting 4.1 million gallons of oil through an ecologically sensitive waterway, a period of incarceration is the only way to vindicate Congress' intent and to deter others from conducting themselves the same way under similar circumstances.

Respectfully submitted,
MICHAEL J. SULLIVAN
United States Attorney

By: _____
JONATHAN F. MITCHELL
Assistant U.S. Attorney

PETER KENYON
Senior Criminal Enforcement Counsel
Environmental Protection Agency