

127 F.3d 1100 (Table)                                                      Page 1
127 F.3d 1100 (Table), 1997 WL 639334 (4th Cir.(W.Va.))
**Unpublished Disposition**
**(Cite as: 127 F.3d 1100, 1997 WL 639334 (4th Cir.(W.Va.)))**

**Briefs and Other Related Documents**

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA4 Rule 36 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Martin Dale **FITZPATRICK**, Defendant-Appellant.
No. 96-4713.

Submitted Sept. 30, 1997.
Decided Oct. 17, 1997.

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington. Joseph Robert Goodwin, District Judge. (CR-96- 36, CR-96-63)

Gene W. Gardner, GARDNER & CYRUS, Huntington, West Virginia, for Appellant. Rebecca A. Betts, United States Attorney, Michael O. Callaghan, Assistant United States Attorney, Charleston, West Virginia, for Appellee.

Before ERVIN, LUTTIG, and MOTZ, Circuit Judges.

OPINION

PER CURIAM:

**\*\*1** Martin Dale Fitzpatrick pled guilty to an information charging him in the Northern District of West Virginia with negligently causing the Pea Ridge Public Service District to violate its permit under the National Pollutant Discharge Elimination System by discharging raw sewage into a river between December 1994 and February 1995. *See* 33 U.S.C. § 2314 (1994), 18 U.S.C. § 2 (1994). He also pled guilty to a separate information charging him in the Southern District of West Virginia with interstate transportation of stolen property. *See* 18 U.S.C. § 2314 (1994). Pursuant to Fed.R.Crim.P. 20,

Fitzpatrick consented to disposition of both charges in the Southern District of West Virginia. He received a 36-month sentence. He appeals this sentence, contending that the district court erred in determining the combined offense level. *See* U.S. Sentencing Guidelines Manual, § 3D1.4 (1995). He also argues that the court clearly erred in finding that his conduct caused the disruption of a public utility, and erred in finding that an enhancement for discharge without a permit applied in his case. We affirm.

For a year and a half, Fitzpatrick and others stole high voltage electrical breakers and starters from various industrial sites and sold them. One of the sites was the Pea Ridge Public Service District. The loss of the breakers which controlled the pumps at a lift station rendered the station inoperable and caused twelve million gallons of raw sewage to be discharged into the Guyandotte River. In March 1995, Fitzpatrick was arrested after electrical devices stolen from an Ohio company were discovered in his car.

The probation officer recommended an adjusted offense level of 18 for the pollution offense. This included a 4-level enhancement for disruption of a public utility and a 4-level enhancement for discharge in violation of a permit. *See* USSG § 2Q1.3(b)(3)-(b)(4). The stolen property offense was placed in a separate group and had an adjusted offense level of 12, but carried a statutory maximum of 12 months imprisonment. The probation officer then applied USSG § 3D1.4. That guideline section sets out a procedure for calculating the combined offense level for multiple counts when there is more than one group of counts. The offense level for the count or group of counts with the highest offense level becomes the combined offense level and may be further adjusted upward depending on the total number of offenses and their relative seriousness. The probation officer also recommended a 3-level adjustment for acceptance of responsibility, resulting in a final combined offense level of 16.

Fitzpatrick objected to this calculation on the ground that the pollution offense, a Class A misdemeanor, was considered the most serious offense because it had the highest offense level. He argued that the lower offense level for the stolen property offense

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

127 F.3d 1100 (Table)
127 F.3d 1100 (Table), 1997 WL 639334 (4th Cir.(W.Va.))
**Unpublished Disposition**
**(Cite as: 127 F.3d 1100, 1997 WL 639334 (4th Cir.(W.Va.)))**

Page 2

should govern the calculation because, as a felony, the stolen property offense was the more serious offense. The district court correctly found that, in determining the combined offense level for multiple counts, the most serious offense is the offense with the highest offense level, regardless of its statutory designation. The district court also found the recommended enhancements under USSG B 2Q1.3 appropriate and declined to depart downward on the ground that Fitzpatrick acted negligently rather than knowingly, although the commentary encourages such a departure. *See* USSG B 2Q1.3, comment. (nn.3, 6-7).

**\*\*2** With seven criminal history points, Fitzpatrick was in criminal history category IV. His guideline range was 33-41 months. The district court announced its intention to impose a sentence of 36 months imprisonment. Fitzpatrick then asserted that his sentence for both offenses would have been less severe had the offenses been prosecuted separately. He complained that he was effectively being penalized for consolidating the offenses in the interest of judicial economy. The government also expressed concerns about the effect of grouping the counts.

Citing guideline section 5G1.2 (Sentencing on Multiple Counts of Conviction), the court ultimately imposed a sentence of 27 months for the pollution offense and a sentence of 12 months for the stolen property offense. Nine months of the 12-month sentence were made consecutive to the 27-month sentence to produce a 36-month sentence.

On appeal, Fitzpatrick first contends that the district court failed to apply USSG B 5G1.1(a) (Sentencing on a Single Count of Conviction) in determining the combined offense level for his two offenses.

That guideline section provides that, when the guideline range is greater than the statutory maximum, the guideline sentence shall be the statutory maximum. From this language, he argues that the district court should have treated the 12-month statutory maximum for his stolen property offense as the "guideline sentence" and thus, the "most serious offense," in determining the combined offense level under USSG B 3D1.4. His argument confuses the functions of the two guidelines. Section 5G1.1 does not come into play until the guideline range has been determined; moreover, it does not apply at all when multiple counts are involved. Therefore, Fitzpatrick's argument is meritless.

Second, Fitzpatrick maintains that the district court clearly erred in finding that a public utility was disrupted, *see* USSG B 2Q1.3, because service to consumers was not affected. Fitzpatrick characterizes the effect of his conduct as an "interruption" rather than a "disruption" of the facility. The district court used the term "interruption" in its finding, but found that loss of the breakers had a significant effect on the sewer plant, which "did not work" without them. Disruption is more than simple interference or interruption. *See United States v. Rutana,* 18 F.3d 363, 365 (6th Cir.1994). In this case, a sewage treatment lift station was disabled and millions of gallons of raw sewage were discharged into the river. Replacement of the stolen electrical equipment cost the Public Service District approximately $56,000. On these facts, we find that the district court did not clearly err in making the enhancement for disruption of a public utility.

Last, Fitzpatrick challenges the enhancement for an offense involving violation of a permit. He does not dispute that the Public Service District violated its permit to operate by discharging untreated sewage, but argues that the enhancement applies only to businesses and persons who operate plants subject to Clean Water Act regulations. We are not persuaded. As the district court found, the guideline applies to anyone convicted of a violation of the statute. We find that the enhancement was correctly made.

**\*\*3** The sentence is therefore affirmed. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

*AFFIRMED*

127 F.3d 1100 (Table), 1997 WL 639334 (4th Cir.(W.Va.)) Unpublished Disposition

**Briefs and Other Related Documents (Back to top)**

• 1997 WL 33513113 (Appellate Brief) Brief of Appellee (Jan. 13, 1997)Original Image of this Document (PDF)

• 1997 WL 33513114 (Appellate Brief) Reply Brief of Appellant (Jan. 13, 1997)Original Image of this Document (PDF)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

127 F.3d 1100 (Table)                                                                                    Page 3
127 F.3d 1100 (Table), 1997 WL 639334 (4th Cir.(W.Va.))
**Unpublished Disposition**
**(Cite as: 127 F.3d 1100,  1997 WL 639334 (4th Cir.(W.Va.)))**

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



242 F.3d 528
242 F.3d 528, 51 ERC 2185, 31 Envtl. L. Rep. 20,509
**(Cite as: 242 F.3d 528)**

Page 1

# H

**Briefs and Other Related Documents**

United States Court of Appeals,
Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
James MING HONG, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
James Ming Hong, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
James Ming Hong, Defendant-Appellant.
**Nos. 00-4335, 00-4462, 00-4502.**

Argued Dec. 8, 2000.
Decided March 8, 2001.

Defendant was convicted and sentenced in the United States District Court for the Eastern District of Virginia, David G. Lowe, United States Magistrate Judge, of negligently violating pretreatment requirements of the Clean Water Act (CWA), but fine was vacated by James R. Spencer, J. Defendant appealed and the United States cross-appealed. The Court of Appeals, Wilkins, Circuit Judge, held that: (1) to convict defendant "as a responsible corporate officer," the Government was not required to prove that defendant was a formally designated corporate officer; (2) evidence was sufficient to prove that defendant's relationship to corporation was such that he possessed authority to prevent the illegal discharges; (3) three-year term of imprisonment was not cruel and unusual punishment; and (4) $100,000 maximum fine provided by the alternative fine statute applied to each count.

Affirmed in part, vacated in part, and remanded.

West Headnotes

**[1] Corporations** 🔗 **1.6(4)**
101k1.6(4) Most Cited Cases
To convict defendant for negligently violating pretreatment requirements of the Clean Water Act (CWA) "as a responsible corporate officer," the Government was not required to prove that defendant was a formally designated corporate officer of the

company committing the violations; rather, the pertinent question was whether the defendant bore such a relationship to the corporation that it was appropriate to hold him criminally liable for failing to prevent the charged violations of the CWA. Federal Water Pollution Control Act Amendments of 1972, ß ß 309(c)(1)(A), (c)(6), 502(5), 33 U.S.C.A. ß ß 1319(c)(1)(A), (c)(6), 1362(5).

**[2] Corporations** 🔗 **1.7(2)**
101k1.7(2) Most Cited Cases
Evidence in prosecution for negligently violating pretreatment requirements of the Clean Water Act (CWA) "as a responsible corporate officer," was sufficient to prove that defendant's relationship to corporation was such that he possessed authority to prevent the illegal discharges; the evidence indicated that although defendant went to great lengths to avoid being formally associated with the corporation, in fact he substantially controlled corporate operations, that he was involved in the purchase of the insufficient filtration system, and that he was in control of corporation's finances and refused to authorize payment for additional filtration media. Federal Water Pollution Control Act Amendments of 1972, ß ß 309(c)(1)(A), (c)(6), 502(5), 33 U.S.C.A. ß ß 1319(c)(1)(A), (c)(6), 1362(5).

**[3] Sentencing and Punishment** 🔗 **1512**
350Hk1512 Most Cited Cases
A three-year term of imprisonment for 13 counts of negligently violating pretreatment requirements of the Clean Water Act (CWA) did not violate the Eighth Amendment prohibition against cruel and unusual punishments on theory it
was grossly disproportionate to the crime committed. U.S.C.A. Const.Amend. 8; Federal Water Pollution Control Act Amendments of 1972, ß ß 309(c)(1)(A), (c)(6), 502(5), 33 U.S.C.A. ß ß 1319(c)(1)(A), (c)(6), 1362(5).

**[4] Fines** 🔗 **1.5**
174k1.5 Most Cited Cases
The $100,000 maximum fine provided by the alternative fine statute applied to each count of conviction for the Class A misdemeanor of negligently violating pretreatment requirements of the Clean Water Act (CWA), rather than the $25,000 maximum fine provided by the CWA, where the offense of conviction allowed a fine per day of violation and the CWA did not specifically preclude

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

242 F.3d 528
242 F.3d 528, 51 ERC 2185, 31 Envtl. L. Rep. 20,509
(Cite as: 242 F.3d 528)

Page 2

application of the alternative fine provision. 18 U.S.C.A. ß 3571; Federal Water Pollution Control Act Amendments of 1972, ß 309(c)(1), 33 U.S.C.A. ß 1319(c)(1); U.S.S.G. ß ß 5E1.2(a), (c)(3, 4), 5E1.2, comment. (n. 5).

**\*529 ARGUED:** John Fontana Cooney, Venable, Baetjer, Howard & Civiletti, L.L.P., Washington, DC, for Appellant. John Staige Davis, V, Assistant United States Attorney, Michael R. Fisher, Special Assistant United States Attorney, Richmond, VA, for Appellee. **ON BRIEF:** Joseph G. Block, Gregory S. Braker, Venable, Baetjer, Howard & Civiletti, L.L.P., Washington, DC, for Appellant. Helen F. Fahey, United States Attorney, Richmond, VA, for Appellee.

Before WILKINSON, Chief Judge, and WILKINS and KING, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge WILKINS wrote the opinion, in which Chief Judge WILKINSON and Judge KING joined.

## OPINION

WILKINS, Circuit Judge:

James Ming Hong appeals his convictions and sentence for violating the Federal Water Pollution Control Act, commonly known as the Clean Water Act (CWA). *See* 33 U.S.C.A. ß 1319(c)(1)(A) (West Supp. 2000). The Government cross-appeals, arguing that the district court erred in vacating the fine imposed by the magistrate judge who convicted and sentenced Hong and instructing the magistrate judge to impose a fine of no more than $25,000 each for 12 of Hong's 13 convictions. We conclude that Hong's challenges to his convictions and term of imprisonment are without merit but that the district court erred in vacating the fine initially imposed by the magistrate judge. Accordingly, we affirm in part, vacate in part, and remand for reimposition of the original fine.

I.

In September 1993, Hong acquired a wastewater treatment facility at Second and Maury Streets in Richmond, Virginia from Environmental Restoration Company, Inc. Hong initially operated the facility under the name ERC-USA but subsequently made several changes to the company name, eventually calling it Avion Environmental Group (Avion). Hong also moved the company's operations to a new facility on Stockton Street in Richmond. Hong

avoided any formal association with Avion and was not identified as an officer of the company. Nevertheless, he controlled the company's finances and played a substantial role in company operations. For example, Hong negotiated the lease \*530 for the Stockton Street facility, [FN1] participated in the purchase of a wastewater treatment system (discussed further below), reviewed marketing reports, urged Avion employees to make the company successful through the use of various marketing strategies, and controlled the payment of Avion's various expenses. Hong maintained an office at Avion from which he conducted business.

> FN1. Hong signed the lease for the Stockton Street facility as Avion's president.

In late 1995, Hong and Robert Kirk, Avion's general manager, began to investigate the possibility of obtaining a carbon-filter treatment system for the Stockton Street facility, which lacked a system to treat wastewater. Hong and Kirk were specifically advised that the treatment system they were considering was designed only as a final step in the process of treating wastewater; it was not intended for use with completely untreated wastewater. Nevertheless, after purchasing the system, Avion used it as the sole means of treating wastewater. The system quickly became clogged. Hong was advised of the problem by Avion employees and inspected the treatment system himself on at least one occasion. Additionally, Bruce Stakeman, who sold the filtration media necessary for the system, advised Hong that the treatment system would not function properly unless it was preceded by an additional filtration mechanism. No additional filtration media were purchased, nor was an additional filtration system installed.

In May 1996, Avion employees began discharging untreated waste-water directly into the Richmond sewer system in violation of Avion's discharge permit. Untreated wastewater was discharged numerous other times during the remainder of 1996. Based on these activities, Hong subsequently was charged by information with 13 counts of negligently violating pretreatment requirements under the CWA. *See* 33 U.S.C.A. ß 1319(c)(1)(A). More specifically, Hong was charged with one count of failing to properly maintain and operate a treatment system and with 12 counts of discharging untreated waste-water. Each count of the information alleged that Hong committed the violations "as a responsible corporate officer." *E.g.,* J.A. 19.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

242 F.3d 528
242 F.3d 528, 51 ERC 2185, 31 Envtl. L. Rep. 20,509
(Cite as: 242 F.3d 528)

Page 4

FN2. This rationale is fatal to Hong's claim that the magistrate judge constructively amended the information by convicting Hong as an owner of Avion rather than as a responsible corporate officer. While the magistrate judge did conclude that Hong was the de facto owner of Avion, the finding of guilt was based on the magistrate judge's determination that the evidence regarding Hong's relationship to Avion demonstrated his responsibility for the discharges.

[2] Regarding that question, Hong contends that the Government failed to prove that his relationship to Avion was *532 such that he possessed authority to prevent the illegal discharges. Ample evidence supports the magistrate judge's finding of guilt, however. The evidence indicated that although Hong went to great lengths to avoid being formally associated with Avion, in fact he substantially controlled corporate operations. Furthermore, Hong was involved in the purchase of the filtration system and was aware, in advance, that the filtration media would quickly be depleted if used as Hong intended. And, the evidence supported a finding that Hong was in control of Avion's finances and refused to authorize payment for additional filtration media. Finally, Hong was regularly present at the Avion site, and discharges occurred openly while Hong was present. Accordingly, we affirm Hong's convictions.

### III.

[3] Hong next challenges his sentence, maintaining that the three-year term of imprisonment imposed by the magistrate judge violates the Eighth Amendment prohibition against "cruel and unusual punishments," U.S. Const. amend. VIII, because it is grossly disproportionate to the crime committed, see *Solem v. Helm*, 463 U.S. 277, 284, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) (observing that the cruel and unusual punishments clause "prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed"). Because Hong failed to challenge his sentence on this basis before the magistrate judge or the district court, our review is for plain error. *See United States v. Olano*, 507 U.S. 725, 731-32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

This court has held that proportionality review is not available for any sentence less than life imprisonment without the possibility of parole. *See United States v. Polk*, 905 F.2d 54, 55 (4th Cir.1990). [FN3] Even if we were to review Hong's claim, however, we would conclude that his sentence was not

disproportionate and thus that no error occurred. Hong argues, essentially, that his sentence of three years is disproportionate because the criminal conduct consisted of the "negligent breach of a single duty of care." Brief of Appellant at 56. Hong's argument glosses over the fact that he was convicted of violating his duty of care not once, but *thirteen times*. The imposition of consecutive one-year terms of imprisonment for three of those convictions is not disproportionate. *See Hawkins v. Hargett*, 200 F.3d 1279, 1285 n. 5 (10th Cir.1999) (explaining that "[t]he Eighth Amendment analysis focuses on the sentence imposed for each specific crime, not on the cumulative sentence for multiple crimes"), *cert. denied*, 531 U.S. 830, 121 S.Ct. 83, 148 L.Ed.2d 45 (2000).

FN3. In arguing that his three-year sentence is disproportionate, Hong relies on two decisions of this court that left open the question of whether proportionality review is appropriate for sentences of less than life without the possibility of parole. *See Sutton v. Maryland*, 886 F.2d 708, 712 (4th Cir.1989); *United States v. Rhodes*, 779 F.2d 1019, 1027-28 (4th Cir.1985). *Polk* answered the question left open in *Sutton* and *Rhodes*.

### IV.

On cross-appeal, the Government challenges the fine of $25,000 imposed on each of Counts Two through Thirteen, [FN4] maintaining that the district court erred in determining that the guidelines precluded application of the alternative fine statute, 18 U.S.C.A. ß 3571 (West 2000). The Government's cross-appeal presents a question of guide-lines interpretation, which we review de novo. *See United States v. Dawkins*, 202 F.3d 711, 714 (4th Cir.), *cert. denied*, 529 U.S. 1121, 120 S.Ct. 1989, 146 L.Ed.2d 816 (2000).

FN4. The magistrate judge also imposed a fine of $100,000 on Count One. That fine is not challenged by either party.

The sentencing guidelines provide that a fine shall be imposed in all cases unless the defendant is unable to pay. *See* U.S.S.G. ß 5E1.2(a). Generally, the amount of the *533 fine is determined by reference to a table that specifies a minimum and maximum fine for each offense level. *See id.* ß 5E1.2(c)(3). However, the guidelines also provide that the maximum fine set forth in the fine table "does not apply if the defendant is convicted under a statute

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

242 F.3d 528
242 F.3d 528, 51 ERC 2185, 31 Envtl. L. Rep. 20,509
(Cite as: 242 F.3d 528)

Page 5

authorizing ... (B) a fine for each day of violation. In such cases, the court may impose a fine up to the maximum authorized *by the statute*." *Id*. ß 5E1.2(c)(4) (emphasis added).

> [4] The parties agree that because the statute of conviction, 33 U.S.C.A. ß 1319(c)(1), authorizes a fine for each day of violation, Hong is subject to a fine "up to the maximum authorized by the statute" pursuant to ß 5E1.2(c)(4). Hong maintains, however, that the guideline language referring to "the maximum[fine] authorized by the statute" limits the potential fine to the maximum specified in the statute of conviction. Under this interpretation, the maximum fine for each of Counts Two through Thirteen is $25,000, as set forth in 33 U.S.C.A. ß 1319(c)(1). The Government, in contrast, argues that ß 5E1.2(c)(4) is properly understood as a directive that the guidelines do not provide any maximum fine when the statute of conviction authorizes a fine per day of violation. Under the Government's interpretation, the maximum fine for each of Counts Two through Thirteen is $100,000, as set forth in 18 U.S.C.A. ß 3571. [FN5] The magistrate judge, believing the Government's position to be correct, imposed a total fine of $1.2 million on Counts Two through Thirteen. On appeal, the district court agreed with Hong that the maximum fine on each count was $25,000; accordingly, it vacated the fine imposed by the magistrate judge and remanded for imposition of a total fine on Counts Two through Thirteen no greater than $300,000.

FN5. The alternative fine statute, 18 U.S.C.A. ß 3571, provides in pertinent part:

> *(b) Fines for individuals.*--Except as provided in subsection (e) of this section, an individual ... may be fined not more than the greatest of--
>
> (1) the amount specified in the law setting forth the offense; [or]
>
> . . . . .
>
> (5) for a Class A misdemeanor that does not result in death, not more than $100,000[.]
>
> . . . . .
>
> *(e) Special rule for lower fine specified in substantive provision.*--If a law setting forth

an offense specifies no fine or a fine that is lower than the fine otherwise applicable under this section and such law, *by specific reference,* exempts the offense from the applicability of the fine otherwise applicable under this section, the defendant may not be fined more than the amount specified in the law setting forth the offense.

18 U.S.C.A. ß 3571 (emphasis added). In short, ß 3571 provides that the maximum possible fine for a Class A misdemeanor of the type committed by Hong is $100,000 unless the statute of conviction--here, 33 U.S.C.A. ß 1319(c)(1)--specifically precludes application of the alternative fine provision. Section 1319(c)(1) does not specifically preclude application of ß 3571.

We conclude that the interpretation of ß 5E1.2(c)(4) by the district court was incorrect. In determining the meaning of the guideline, we are guided by the commentary to ß 5E1.2, which specifically provides that "the guidelines do not limit maximum fines" when ß 5E1.2(c)(4) applies. U.S.S.G. ß 5E1.2, comment. (n.5); *cf. id.* comment. (n. 2) (citing the alternative fine provision for the proposition that "[i]n general, the maximum fine permitted by law as to each count of conviction is ... $100,000 for a Class A misdemeanor"). It is settled law that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States,* 508 U.S. 36, 38, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993). Here, we perceive no conflict between the guideline and the commentary. Rather, application note 5 explains the import of ß 5E1.2(c)(4), namely, that the guidelines impose no limit on the maximum fine when the offense of conviction allows a fine per *534 day of violation. We therefore vacate the fine and remand for reimposition of the fine initially imposed by the magistrate judge.

V.

In sum, we conclude that Hong was properly held criminally responsible for his role in failing to prevent Avion's violations of the CWA and that the 36-month sentence imposed on Hong did not violate the Eighth Amendment. Accordingly, we affirm Hong's convictions and sentence. Because the district court erred in concluding that the maximum fine for each of Counts Two through Thirteen was $25,000, we vacate the fine and remand for reimposition of the original fine.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

242 F.3d 528
242 F.3d 528, 51 ERC 2185, 31 Envtl. L. Rep. 20,509
**(Cite as: 242 F.3d 528)**

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED.*

242 F.3d 528, 51 ERC 2185, 31 Envtl. L. Rep. 20,509

**Briefs and Other Related Documents (Back to top)**

• 2000 WL 33992460 (Appellate Brief) Reply Brief of Appellee and Cross-Appellant (Oct. 12, 2000)Original Image of this Document (PDF)

• 2000 WL 33992461 (Appellate Brief) Brief of Appellee and Cross-Appellant (Sep. 05, 2000)Original Image of this Document (PDF)

•   0 0 - 4 5 0 2             (Docket)
(Jul. 07, 2000)

•   0 0 - 4 4 6 2             (Docket)
(Jun. 20, 2000)

•   0 0 - 4 3 3 5             (Docket)
(Apr. 28, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**34**

million gallons of raw sewage and sludge were discharged into Brokenstraw Creek.

This case was investigated by the U.S. EPA Criminal Investigation Division and the Pennsylvania Department of Environmental Quality.

The case was prosecuted by AUSA Connie Bowden (412) 644-3500.

## United States v. William Lee Slocum (W.D. Pa.), No. CR 99-26E

### CWA

On May 9, 2000, William Lee Slocum, Jr., currently a Pennsylvania State Senator, was sentenced to serve one month's imprisonment followed by one year of supervised release, the first five months of which are to be served on house arrest. He was additionally ordered to pay a $15,000 fine.

Slocum pled guilty in January 2000 to six counts of negligently violating the Clean Water Act. Slocum operated the Youngsville Sewage Treatment Plant between 1983 and 1995. During his tenure, he caused repeated discharges of raw sewage and sewage sludge into Brokenstraw Creek which is a tributary of the Allegheny River. Slocum further directed the installation of a bypass gate which was used to discharge raw sewage. He also failed to provide for the removal of sewage sludge from the plant on a regular basis and failed to ensure that the plant's flow meter was providing accurate readings. As a result, approximately 3.5

CLOSED

# U.S. District Court
## Western District of Pennsylvania (Erie)
### CRIMINAL DOCKET FOR CASE #: 1:99-cr-00026-SJM-ALL

Case title: USA v. SLOCUM

Date Filed: 07/15/1999

Assigned to: Judge Sean J.
McLaughlin

## Defendant

**WILLIAM LEE SLOCUM, JR.**
(1)
*TERMINATED: 05/12/2000*

represented by **John Paul Garhart**
Erie County District Attorney's Office
140 West 6th Street
Erie, PA 16501
(814) 451-6349
Email: jgarhart@eriecountygov.org
*TERMINATED: 05/12/2000*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:371 CONSPIRACY<br>(1) | Count 1 is dismissed on the motion of the United States. |
| 33:1319 (c)(2)(A) and 18:2(a)<br>KNOWINGLY DISCHARGING<br>POLLUTION INTO WATERS<br>OF U.S.<br>(2-7) | Deft pleaded guilty to counts 2 thru 7. the mandatory special assessment is included in the portion of this judgment that imposes a fine. Deft is committed to the custody of the U.S Bureau of Prisons to be imprisoned for a term of 1 month on each cou nt, to be served concurrently for a total sentence of 1 month. Deft shall surrender for service of sentence at the institution designated by the Bureau of Prisons as notified by the U.S. Marshal. Deft shall be on supervised release for a term of 1 ye ar. This term consist of terms of 1 years on each of Counts, 2,3,4,5,6, and 7 all such terms to run concurrently. Standard conditions of supervision. Deft shall pay to the U.S. the sum $15,150.00, consisting of a fine of $15,000.00 and a sp ecial assessment of $150.00. This sum shall be paid in full not later than within 1 year of the date of this judgment. Statement of Reasons attached. |

## Highest Offense Level (Opening)

Felony

**Terminated Counts**                              **Disposition**

None


**Highest Offense Level
(Terminated)**

None


**Complaints**                                      **Disposition**

None


**Plaintiff**

**UNITED STATES OF AMERICA**          represented by   **Constance M. Bowden**
                                                       United States Attorney's Office
                                                       700 Grant Street
                                                       Suite 400
                                                       Pittsburgh, PA 15219
                                                       (412) 644 6856
                                                       Email: constance.bowden@usdoj.gov
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/15/1999 | 1 | INDICTMENT as to WILLIAM LEE SLOCUM (1) count(s) 1, 2-7 (mad) (Entered: 07/16/1999) |
| 07/15/1999 | 2 | Indictment Memorandum as to WILLIAM LEE SLOCUM JR. (mad) Modified on 07/16/1999 (Entered: 07/16/1999) |
| 07/15/1999 | 3 | REQUEST for Summons for WILLIAM LEE SLOCUM JR. to appear for arraignment at 3:00 pm 8/2/99 for WILLIAM LEE SLOCUM JR. before Magistrate Judge Susan P. Baxter and post O.R. Bond in the amount $2,000.00 dollars. SUMMONS(ES) issued. (mad) Modified on 07/20/1999 (Entered: 07/16/1999) |
| 07/20/1999 | 4 | Arraignment as to WILLIAM LEE SLOCUM JR. set for 3:00 8/2/99 for WILLIAM LEE SLOCUM JR. before Magistrate Judge Susan P. Baxter (mad) (Entered: 07/20/1999) |
| 08/03/1999 |  | Arraignment as to WILLIAM LEE SLOCUM JR. held on 8/2/99 before Magistrate Judge Susan P. Baxter [ ] Defendant pleads not guilty. ( with Document # 1 ) (mad) (Entered: 08/03/1999) |
| 08/03/1999 | 5 | MAGISTRATE JUDGE'S REPORT OF ARRAIGNMENT as to WILLIAM LEE SLOCUM JR. (mad) Modified on 01/21/2000 (Entered: 08/03/1999) |
| 08/03/1999 |  | OR BOND entered by WILLIAM LEE SLOCUM JR. in the amount of $3,000.00 (mad) (Entered: 08/03/1999) |
| 08/03/1999 | 6 | ORDER Setting Conditions of Release as to WILLIAM LEE SLOCUM JR. Bond set to $3,000.00 OR for WILLIAM LEE SLOCUM. (signed by Magistrate Judge Susan P. Baxter on 8/2/99) CM all parties of record. (mad) (Entered: 08/03/1999) |

| 08/03/1999 | 7 | NOTICE of Appearance for WILLIAM LEE SLOCUM JR. by Attorney John Paul Garhart (mad) (Entered: 08/03/1999) |
|---|---|---|
| 08/10/1999 | 8 | Receipt for LCR 16.1 Material as to WILLIAM LEE SLOCUM JR. (mad) (Entered: 08/10/1999) |
| 08/12/1999 | 9 | MOTION by WILLIAM LEE SLOCUM JR. to Extend Time to file pretrial motions with Proposed Order. (mad) (Entered: 08/12/1999) |
| 08/12/1999 | | ORDER upon motion granting [9-1] motion to Extend Time to file pretrial motions as to WILLIAM LEE SLOCUM (1), set Motion Filing deadline to 9/25/99 for WILLIAM LEE SLOCUM JR. Trial will then commence in the October (no later) Trial Term. A date or short term trial list will be made available at that time. The time period from 8/12/99, to 9/24/99 is hereby excludable delay. (signed by Judge Sean J. McLaughlin on 8/12/99) CM all parties of record. (mad) (Entered: 08/12/1999) |
| 09/14/1999 | 10 | SUMMONS Returned Executed as to WILLIAM LEE SLOCUM JR. 7/26/99 (mad) (Entered: 09/15/1999) |
| 09/24/1999 | 11 | MOTION by WILLIAM LEE SLOCUM JR. to Extend Time with Proposed Order. (nk) (Entered: 09/24/1999) |
| 09/27/1999 | | ORDER upon motion granting [11-1] motion to Extend Time as to WILLIAM LEE SLOCUM (1), reset Motion Filing deadline to 10/8/99 for WILLIAM LEE SLOCUM JR. , reset Jury Trial for 9:00 12/1/99 for WILLIAM LEE SLOCUM JR. , to Continue in Interests of Justice Time excluded from 9/24/99 to 10/8/99 (signed by Judge Sean J. McLaughlin on 9/27/99) CM all parties of record. (sdp) (Entered: 09/27/1999) |
| 10/08/1999 | 12 | MOTION by WILLIAM LEE SLOCUM JR. to Dismiss the Indictment in whole or in part containing argument and authority in support thereof with Proposed Order. (nk) (Entered: 10/08/1999) |
| 10/08/1999 | 13 | MOTION by WILLIAM LEE SLOCUM JR. for pretrial conference with Proposed Order. (nk) (Entered: 10/08/1999) |
| 10/08/1999 | 14 | MOTION by WILLIAM LEE SLOCUM JR. for production of exculpatory material containing argument and authority in support thereof with Proposed Order. (nk) (Entered: 10/08/1999) |
| 10/08/1999 | 15 | MOTION by WILLIAM LEE SLOCUM JR. for Bill of Particulars with Proposed Order. (nk) (Entered: 10/08/1999) |
| 10/20/1999 | 16 | MOTION by USA as to WILLIAM LEE SLOCUM JR. to Extend Time within which to file pretrial motions with Proposed Order. (mad) (Entered: 10/20/1999) |
| 10/21/1999 | | ORDER upon motion granting [16-1] motion to Extend Time within which to file pretrial motions as to WILLIAM LEE SLOCUM (1) (signed by Judge Sean J. McLaughlin on 10/21/99) CM all parties of record. (mad) (Entered: 10/21/1999) |
| 11/04/1999 | 17 | Oral Argument/ Pre-trial conference and if the Court determines necessary, an Evidentiary Hearing as to WILLIAM LEE SLOCUM JR. set at 9:30 11/29/99 for WILLIAM LEE SLOCUM JR. before Judge Sean J. McLaughlin (mad) Modified on 01/21/2000 (Entered: 11/09/1999) |
| 11/05/1999 | 18 | RESPONSE by USA as to WILLIAM LEE SLOCUM JR. re [15-1] motion for Bill of Particulars, [14-1] motion for production of exculpatory material containing argument and authority in support thereof, [13-1] motion for pretrial conference, [12-1] motion to |

| | | |
|---|---|---|
| | | Dismiss the Indictment in whole or in part containing argument and authority in support thereof (mad) (Entered: 11/09/1999) |
| 11/19/1999 | 19 | MOTION by WILLIAM LEE SLOCUM JR. to continue trial from December 1999 until January 2000 term of Court with Proposed Order. (mad) (Entered: 11/19/1999) |
| 11/19/1999 | 20 | AMENDED NOTICE of Appearance for WILLIAM LEE SLOCUM JR. by Attorney John Paul Garhart Reflecting counsel's New Address (mad) (Entered: 11/19/1999) |
| 11/24/1999 | 22 | Status conference as to WILLIAM LEE SLOCUM JR. held on 11/24/99 before Judge Sean J. McLaughlin [ Reporter: Ron Bench ] Evidentiary Hearing on motion for Malicious Prosecution is Denied; Argument is cancelled; Trial expected to be 3 weeks in duration. Set for 1/18/00 Trial. (mad) Modified on 01/21/2000 (Entered: 11/29/1999) |
| 11/24/1999 | | ORDER upon motion granting [19-1] motion to continue trial from December 1999 until January 2000 term of Court as to WILLIAM LEE SLOCUM (1) (signed by Judge Sean J. McLaughlin on 11/24/99) CM all parties of record. (mad) (Entered: 11/29/1999) |
| 11/26/1999 | 21 | MOTION by COMMONWEALTH OF PA as to WILLIAM LEE SLOCUM JR. to Quash subpoenas issued to William E. McCarthy and Christina S. Nagy with Proposed Order. (mad) (Entered: 11/29/1999) |
| 11/29/1999 | | Minute entry as to WILLIAM LEE SLOCUM JR.: mooting [21-1] motion to Quash subpoenas issued to William E. McCarthy and Christina S. Nagy as to WILLIAM LEE SLOCUM (1) Hearing was not held - no need to subpoena (mad) (Entered: 11/29/1999) |
| 11/29/1999 | 23 | Jury trial as to WILLIAM LEE SLOCUM JR. set at 8:30 1/31/00 for WILLIAM LEE SLOCUM JR. before Judge Sean J. McLaughlin (mad) (Entered: 11/29/1999) |
| 12/10/1999 | 24 | Jury trial as to WILLIAM LEE SLOCUM JR. set at 1/18/00 for WILLIAM LEE SLOCUM JR. before Judge Sean J. McLaughlin (mad) (Entered: 12/10/1999) |
| 01/03/2000 | 25 | Pre-trial conference as to WILLIAM LEE SLOCUM JR. set at 10:00 1/6/00 for WILLIAM LEE SLOCUM JR. before Judge Sean J. McLaughlin (mad) Modified on 01/26/2000 (Entered: 01/03/2000) |
| 01/06/2000 | 26 | Pre-trial conference as to WILLIAM LEE SLOCUM JR. held on 1/6/00 before Judge Sean J. McLaughlin [ Reporter: Ron Bench ] Trial still scheduled for 1/18/00 (mad) Modified on 01/26/2000 (Entered: 01/06/2000) |
| 01/11/2000 | 27 | Proposed Voir Dire Questions by USA as to WILLIAM LEE SLOCUM JR. (nk) (Entered: 01/11/2000) |
| 01/14/2000 | 28 | Status conference as to WILLIAM LEE SLOCUM JR. held on 1/14/00 before Judge Sean J. McLaughlin [ Reporter: Ron Bench ] Change of plea scheduled 11:00 a.m. 1/18/00. Counts 2-7 of Indictment - Memoranda will be faxed to Court on lesser charge. (mad) Modified on 04/10/2000 (Entered: 01/18/2000) |
| 01/18/2000 | | CHANGE OF PLEA from Not Guilty to Guilty: WILLIAM LEE SLOCUM (1) count(s) 2-7 on 1/18/00 (to the lesser included charges in counts 2-7, 33:1319 (cc)(1)(A) before Judge Sean J. McLaughlin with 1 (mad) (Entered: 01/18/2000) |
| 01/18/2000 | 29 | Change of Plea Hearing as to WILLIAM LEE SLOCUM JR. held on 1/18/00 before Judge Sean J. McLaughlin [ Reporter: Ron Bench ] Deft sworn; 52 years old; 3.A. from Pitt-Bradford; deft found competent to plea; deft informed of his rights; deft waives reading the charge; deft read charges of lesser offenses in counts 2-7; plea Agreement - Govt Exhibit 1 - marked and admitted; Pre-sentence Report ordered; Sentence set for 4/ |

|  |  | 17/00 at 10:00 a.m.; Bond continued pending sentencing. (mad) Modified on 01/21/ 2000 (Entered: 01/18/2000) |
|---|---|---|
| 01/19/2000 | 30 | Sentencing Hearing set for 10:00 4/17/00 for WILLIAM LEE SLOCUM JR. before Judge Sean J. McLaughlin WILLIAM LEE SLOCUM (1) count(s) 1, 2-7 (mad) (Entered: 01/19/2000) |
| 01/24/2000 |  | Special Assessment paid by defendant WILLIAM LEE SLOCUM JR. in the amount of $ 150.00 Receipt # 00000313 (mad) (Entered: 01/24/2000) |
| 02/16/2000 | 31 | TRANSCRIPT of Change of Plea as to WILLIAM LEE SLOCUM JR. for date of 1/ 18/00 before McLaughlin, J. Reporter: Ronald J. Bench (mad) (Entered: 02/16/2000) |
| 03/28/2000 | 32 | Position by USA with respect to sentencing factors as to WILLIAM LEE SLOCUM JR. (mad) Modified on 05/16/2000 (Entered: 03/29/2000) |
| 04/07/2000 | 33 | Sentencing Hearing set for 1:30 5/9/00 for WILLIAM LEE SLOCUM JR. before Judge Sean J. McLaughlin WILLIAM LEE SLOCUM (1) count(s) 1, 2-7 (mad) (Entered: 04/07/2000) |
| 05/09/2000 | 34 | Sentencing Hearing held on 5/9/00 before Judge Sean J. McLaughlin [ Reporter: Ron Bench ] re: WILLIAM LEE SLOCUM (1) count(s) 1, 2-7 Motion for Downward Departure vis-a-vis letter is GRANTED. Correspondence- 5/7/00 (Atty.- Garhart) to be made part of record. (mad) (Entered: 05/10/2000) |
| 05/12/2000 | 35 | JUDGMENT WILLIAM LEE SLOCUM (1) count(s) 2-7. Deft pleaded guilty to counts 2 thru 7. the mandatory special assessment is included in the portion of this judgment that imposes a fine. Deft is committed to the custody of the U.S Bureau of Prisons to be imprisoned for a term of 1 month on each count, to be served concurrently for a total sentence of 1 month. Deft shall surrender for service of sentence at the institution designated by the Bureau of Prisons as notified by the U.S. Marshal. Deft shall be on supervised release for a term of 1 year. This term consist of terms of 1 years on each of Counts, 2,3,4,5,6, and 7 all such terms to run concurrently. Standard conditions of supervision. Deft shall pay to the U.S. the sum $15,150.00, consisting of a fine of $15,000.00 and a special assessment of $150.00. This sum shall be paid in full not later than within 1 year of the date of this judgment. Statement of Reasons attached. , WILLIAM LEE SLOCUM (1) count(s) 1. Count 1 is dismissed on the motion of the United States. (signed by Judge Sean J. McLaughlin on 5/12/00) (mad) Modified on 05/ 19/2000 (Entered: 05/16/2000) |
| 05/15/2000 | 36 | TRANSCRIPT ( Partial Transcript) as to WILLIAM LEE SLOCUM JR. for date of 5/ 9/00 held before McLaughlin, J. Reporter: Ronald J. Bench (mad) (Entered: 05/16/2000) |
| 05/30/2000 | 37 | TRANSCRIPT of SENTENCING as to WILLIAM LEE SLOCUM JR. for date of 5/ 9/00 before McLaughlin, J. Reporter: Ronld J. Bench (mad) (Entered: 05/30/2000) |
| 08/01/2000 | 38 | Judgment Returned Executed as to WILLIAM LEE SLOCUM JR.; on 7/17/00 (mad) (Entered: 08/02/2000) |
| 05/21/2001 | 39 | Satisfaction of Judgment as to Special Assessment by WILLIAM LEE SLOCUM JR. (mad) (Entered: 05/22/2001) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/19/2005 08:34:06 | | |
| **PACER Login:** sf0012 | **Client Code:** | 2207.001 |
| **Description:** | Docket Report | **Search Criteria:** 1:99-cr-00026-SJM |
| **Billable Pages:** 5 | **Cost:** | 0.40 |



176 F.3d 1116, 99 Cal. Daily Op. Serv. 1987, 29
Envtl. L. Rep. 21,049, 1999 Daily Journal D.A.R.
2590, 48 ERC 1303
Briefs and Other Related Documents

United States Court of Appeals,Ninth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Edward HANOUSEK, Jr., Defendant-Appellant.
No. 97-30185.

Argued and Submitted May 4, 1998.
Decided March 19, 1999.

Defendant was convicted by jury in the United States
District Court for the District of Alaska , James M.
Fitzgerald, J., of negligently discharging harmful
quantity of oil into navigable water of United States.
Defendant appealed. The Court of Appeals , David R.
Thompson, Circuit Judge, held that: (1) person who
acts with ordinary negligence in violating statute
proscribing actual discharge of harmful quantity of
oil into navigable waters of United States may be
subject to criminal penalties; (2) provision of Clean
Water Act proscribing actual discharge of harmful
quantity of oil into navigable waters of United States
does not violate due process by permitting criminal
penalties for ordinary negligent conduct; (3)
instruction adequately explained that defendant could
be convicted based only on his own negligent
conduct; and (4) evidence supported conviction.

Affirmed.

West Headnotes

**[1] Criminal Law 110** 🔑 **1139**
110k1139 Most Cited Cases
Whether jury instruction provided by district court
misstated statutory element of offense presents a
question of statutory interpretation reviewed de novo.

**[2] Statutes 361** 🔑 **188**
361k188 Most Cited Cases

**Statutes 361** 🔑 **190**
361k190 Most Cited Cases
Statutory interpretation begins with the plain
language of the statute; if the language of the statute

is clear, court need look no further than that language
in determining the statute's meaning.

**[3] Statutes 361** 🔑 **205**
361k205 Most Cited Cases
In interpreting statute, particular phrases must be
construed in light of the overall purpose and structure
of the whole statutory scheme.

**[4] Statutes 361** 🔑 **212.6**
361k212.6 Most Cited Cases
When statute to be interpreted does not define term,
court starts with the assumption that the legislative
purpose is expressed by the ordinary meaning of the
words used.

**[5] Statutes 361** 🔑 **195**
361k195 Most Cited Cases
When Congress includes particular language in one
section of a statute but omits it in another section of
the same Act, it is generally presumed that Congress
acts intentionally and purposely in the disparate
inclusion or exclusion.

**[6] Statutes 361** 🔑 **212.1**
361k212.1 Most Cited Cases

**Statutes 361** 🔑 **212.7**
361k212.7 Most Cited Cases
Under principles of statutory interpretation, Congress
is presumed to have known of its former legislation
and to have passed new laws in view of the
provisions of the legislation already enacted.

**[7] Environmental Law 149E** 🔑 **743**
149Ek743 Most Cited Cases
        (Formerly 199k25.7(24)    Health and
Environment)
Person who acts with ordinary negligence in violating
statute proscribing actual discharge of harmful
quantity of oil into navigable waters of United States,
adjoining shore lines, or waters of contiguous zone
may be subject to criminal penalties under Clean
Water Act.  Federal Water Pollution Control Act
Amendments of 1972, ß ß  309(c)(1)(A), 311(b)(3),
(b)(7)(D), 33 U.S.C.A. ß ß   1319(c)(1)(A) ,
1321(b)(3), (b)(7)(D).

**[8] Criminal Law 110** 🔑 **1139**

176 F.3d 1116, 99 Cal. Daily Op. Serv. 1987, 29 Envtl. L. Rep. 21,049, 1999 Daily Journal D.A.R. 2590, 48 ERC 1303
**(Cite as: 176 F.3d 1116)**

110k1139 Most Cited Cases
Court of Appeals reviews de novo issue of whether a statute violates a defendant's right to due process. U.S.C.A. Const.Amends. 5 , 14.

## [9] Constitutional Law 92 🔑258(1)
92k258(1) Most Cited Cases
Public welfare statute may subject a person to criminal liability for his or her ordinary negligence without violating due process. U.S.C.A. Const.Amends. 5 , 14.

## [10] Constitutional Law 92 🔑258(3.1)
92k258(3.1) Most Cited Cases

## Environmental Law 149E 🔑735
149Ek735 Most Cited Cases
         (Formerly 199k25.5(2)    Health and Environment)
As public welfare legislation, provision of Clean Water Act proscribing actual discharge of harmful quantity of oil into navigable waters of United States, adjoining shore lines, or waters of contiguous zone does not violate due process by permitting criminal penalties for ordinary negligent conduct. U.S.C.A. Const.Amend. 5 ; Federal Water Pollution Control Act Amendments of 1972, ß   309(c)(1)(A), 33 U.S.C.A. ß 1319(c)(1)(A).

## [11] Environmental Law 149E 🔑760
149Ek760 Most Cited Cases
         (Formerly 199k25.7(24)    Health and Environment)
Instruction adequately explained that defendant charged with negligently discharging harmful quantity of oil into navigable water of United States could be convicted only on basis of his own negligent conduct, and not on basis of negligence of others working on project on which oil discharge occurred, when it required jury to find that defendant "caused the discharge of oil" and that the discharge was "caused by the negligence of" defendant. Federal Water Pollution Control Act Amendments of 1972, ß 309(c)(1)(A), 33 U.S.C.A. ß 1319(c)(1)(A).

## [12] Criminal Law 110 🔑1139
110k1139 Most Cited Cases
Court of Appeals reviews de novo whether a district court's instructions adequately cover a defense theory.

## [13] Criminal Law 110 🔑822(1)
110k822(1) Most Cited Cases

Court of Appeals will affirm a district court's refusal to give an otherwise proper theory-of-defense instruction if the instructions actually given, in their entirety, adequately cover the defense theory.

## [14] Criminal Law 110 🔑713
110k713 Most Cited Cases
During closing arguments, prosecutor did not improperly invite jury to convict defendant of negligently discharging harmful quantity of oil into navigable water of United States under theory of vicarious liability by indicating that defendants, who were responsible for project during which oil pipeline was ruptured, were guilty as soon as backhoe operator struck unprotected pipeline and that "the buck stop[ped]" with defendants; read in context, prosecutor's statements properly contended that defendants failed to protect pipeline adequately and should be held responsible for their negligent conduct. Federal Water Pollution Control Act Amendments of 1972, ß 309(c)(1)(A), 33 U.S.C.A. ß 1319(c)(1)(A).

## [15] Criminal Law 110 🔑26
110k26 Most Cited Cases
To establish the element of causation, the government must prove beyond a reasonable doubt that the defendant's conduct was both the cause in fact and the proximate cause of the harm.

## [16] Criminal Law 110 🔑26
110k26 Most Cited Cases
To prove proximate cause, the government must establish that the harm was a foreseeable result of the conduct.

## [17] Environmental Law 149E 🔑760
149Ek760 Most Cited Cases
         (Formerly 199k25.7(24)    Health and Environment)
Causation instruction given in prosecution for negligently discharging harmful quantity of oil into navigable water of United States was sufficient, given that it required jury to find that defendant's conduct had direct and substantial connection to discharge of oil. Federal Water Pollution Control Act Amendments of 1972, ß 309(c)(1)(A), 33 U.S.C.A. ß 1319(c)(1)(A).

## [18] Criminal Law 110 🔑1144.13(3)
110k1144.13(3) Most Cited Cases

## Criminal Law 110 🔑1159.2(7)

110k1159.2(7) Most Cited Cases
In reviewing challenge to sufficiency of evidence to support conviction, Court of Appeals reviews the evidence in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

## [19] Environmental Law 149E ☜═➣743
149Ek743 Most Cited Cases
          (Formerly 199k25.7(24)     Health and Environment)
Conviction for negligently discharging harmful quantity of oil into navigable water of United States was supported by evidence that defendant was responsible for rock-quarrying project and directed daily activities of contractor's equipment and employees, that project involved use of heavy equipment and machinery, that, contrary to customary practice, oil pipeline running through worksite was not protected by railroad ties and fill after defendant took over responsibility for project, that section of pipeline where rupture occurred was not so protected, that pipeline was ruptured by backhoe when operator was removing rocks from nearby railroad tracks, and that harmful quantity of oil was discharged into river.    Federal Water Pollution Control Act Amendments of 1972, ß ß 309(c)(1)(A), 311(b)(3), 33 U.S.C.A. ß ß 1319(c)(1)(A), 1321(b)(3).

## [20] Sentencing and Punishment 350H ☜═➣752
350Hk752 Most Cited Cases
          (Formerly 110k1251)
Finding that defendant convicted of negligently discharging harmful quantity of oil into navigable water of United States was supervisor, and thus subject to two-point supervisor enhancement under Sentencing Guidelines, was not clearly erroneous, given that backhoe operator who ruptured oil pipeline during rock-quarrying project was participant in criminal activity, even though not prosecuted, and that defendant supervised project.    Federal Water Pollution Control Act Amendments of 1972, ß ß 309(c)(1)(A), 311(b)(3), 33 U.S.C.A. ß ß 1319(c)(1)(A), 1321(b)(3) ; U.S.S.G. ß 3B1.1(c), 18 U.S.C.A.

## [21] Criminal Law 110 ☜═➣1023(11)
110k1023(11) Most Cited Cases
Court of Appeals lacked jurisdiction to review district court's refusal to depart downward from Sentencing Guidelines when district court recognized its

discretion to make requested departures but chose not to do so.  U.S.S.G. ß 1B1.1 et seq., 18 U.S.C.A.

*1118 Bruce E. Gagnon, Atkinson, Conway & Gagnon , Anchorage, Alaska, and Brian M. Doherty , Gilmore & Doherty, Anchorage, Alaska, for the defendant-appellant.
Ellen J. Durkee , United States Department of Justice, Washington, D.C., for the plaintiff-appellee.

Appeal from the United States District Court for the District of Alaska; James M. Fitzgerald , District Judge, Presiding.  D.C. No. CR-96-00040-JMF.

Before: THOMPSON and TASHIMA , Circuit Judges, and STAGG, District Judge. FN*

> FN* Honorable Tom Stagg, Senior United States District Judge for the Western District of Louisiana, sitting by designation.

DAVID R. THOMPSON, Circuit Judge:
Edward Hanousek, Jr., appeals his conviction and sentence for negligently discharging a harmful quantity of oil into a navigable water of the United States, in violation of the Clean Water Act, 33 U.S.C. ß ß 1319(c)(1)(A) & 1321(b)(3).  Hanousek contends that the district court erred: (1) by failing to instruct the jury that the government must prove that he acted with criminal negligence as opposed to ordinary negligence, (2) by failing to instruct the jury that he could not be found vicariously liable, (3) by failing to instruct the jury properly on causation, and (4) by incorrectly applying the United States Sentencing Guidelines.

Hanousek also argues that section 1319(c)(1)(A) violates due process if it permits a criminal conviction for ordinary negligence and that, in any event, the evidence was insufficient to support his conviction.  We have jurisdiction under 28 U.S.C. ß 1291 and we affirm.

### 1119FACTS

Hanousek was employed by the Pacific & Arctic Railway and Navigation Company (Pacific & Arctic) as roadmaster of the White Pass & Yukon Railroad, which runs between Skagway, Alaska, and Whitehorse, Yukon Territory, Canada.    As

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

176 F.3d 1116                                                                                                    Page 4
176 F.3d 1116, 99 Cal. Daily Op. Serv. 1987, 29 Envtl. L. Rep. 21,049, 1999 Daily Journal D.A.R. 2590, 48 ERC
1303
**(Cite as: 176 F.3d 1116)**

roadmaster, Hanousek was responsible under his contract "for every detail of the safe and efficient maintenance and construction of track, structures and marine facilities of the entire railroad ... and [was to ] assume similar duties with special projects."

One of the special projects under Hanousek's supervision was a rock-quarrying project at a site alongside the railroad referred to as "6-mile," located on an embankment 200 feet above the Skagway River. The project was designed to realign a sharp curve in the railroad and to obtain armor rock for a ship dock in Skagway. The project involved blasting rock outcroppings alongside the railroad, working the fractured rock toward railroad cars, and loading the rock onto railroad cars with a backhoe. Pacific & Arctic hired Hunz & Hunz, a contracting company, to provide the equipment and labor for the project.

At 6-mile, a high-pressure petroleum products pipeline owned by Pacific & Arctic's sister company, Pacific & Arctic Pipeline, Inc., runs parallel to the railroad at or above ground level, within a few feet of the tracks. To protect the pipeline during the project, a work platform of sand and gravel was constructed on which the backhoe operated to load rocks over the pipeline and into railroad cars. The location of the work platform changed as the location of the work progressed along the railroad tracks. In addition, when work initially began in April, 1994, Hunz & Hunz covered an approximately 300-foot section of the pipeline with railroad ties, sand, and ballast material to protect the pipeline, as was customary. After Hanousek took over responsibility for the project in May, 1994, no further sections of the pipeline along the 1000-foot work site were protected, with the exception of the movable backhoe work platform.

On the evening of October 1, 1994, Shane Thoe, a Hunz & Hunz backhoe operator, used the backhoe on the work platform to load a train with rocks. After the train departed, Thoe noticed that some fallen rocks had caught the plow of the train as it departed and were located just off the tracks in the vicinity of the unprotected pipeline. At this location, the site had been graded to finish grade and the pipeline was covered with a few inches of soil. Thoe moved the backhoe off the work platform and drove it down alongside the tracks between 50 to 100 yards from the work platform. While using the backhoe bucket to sweep the rocks from the tracks, Thoe struck the pipeline causing a rupture. The pipeline was carrying heating oil, and an estimated 1,000 to 5,000

gallons of oil were discharged over the course of many days into the adjacent Skagway River, a navigable water of the United States.

Following an investigation, Hanousek was charged with one count of negligently discharging a harmful quantity of oil into a navigable water of the United States, in violation of the Clean Water Act, 33 U.S.C. ß ß 1319(c)(1)(A) & 1321(b)(3). Hanousek was also charged with one count of conspiring to provide false information to United States Coast Guard officials who investigated the accident, in violation of 18 U.S.C. ß ß 371 , 1001. FN1

> FN1. The government also charged M. Paul Taylor, an officer of Arctic & Pacific and Arctic & Pacific Pipeline, Inc., with one count of negligently discharging a harmful quantity of oil into a navigable water in violation of 33 U.S.C. ß ß 1319(c)(1)(A) & 1321(b)(3) , one count of failing to report a discharge in violation of 33 U.S.C. ß 1321(b)(5) , one count of conspiracy to make false statements in violation of 18 U.S.C. ß ß 371 , 1001 , five counts of making false statements in violation of 18 U.S.C. ß 1001, and one count of obstructing justice. In the joint trial with Hanousek, the jury acquitted Taylor of all charges except two counts of making false statements in violation of 18 U.S.C. ß 1001.

**\*1120** After a twenty-day trial, the jury convicted Hanousek of negligently discharging a harmful quantity of oil into a navigable water of the United States, but acquitted him on the charge of conspiring to provide false information. The district court imposed a sentence of six months of imprisonment, six months in a halfway house and six months of supervised release, as well as a fine of $5,000. This appeal followed.

### DISCUSSION

#### A. Negligence Jury Instruction

Hanousek contends the district court erred by failing to instruct the jury that, to establish a violation under 33 U.S.C. ß 1319(c)(1)(A), the government had to prove that Hanousek acted with criminal negligence, as opposed to ordinary negligence, in discharging a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

harmful quantity of oil into the Skagway River. In his proposed jury instruction, Hanousek defined criminal negligence as "a gross deviation from the standard of care that a reasonable person would observe in the situation." *See* American Law Institute, *Model Penal Code* ß 2.02(2)(d) (1985). Over Hanousek's objection, the district court instructed the jury that the government was required to prove only that Hanousek acted negligently, which the district court defined as "the failure to use reasonable care."

[1] Whether the jury instruction provided by the district court misstated an element of 33 U.S.C. ß 1319(c)(1)(A) presents a question of statutory interpretation, which we review de novo. *See United States v. Weitzenhoff,* 35 F.3d 1275, 1283 (9th Cir.1993).

[2] [3] Statutory interpretation begins with the plain language of the statute. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). If the language of the statute is clear, we need look no further than that language in determining the statute's meaning. *See United States v. Lewis,* 67 F.3d 225, 228 (9th Cir.1995). "Particular phrases must be construed in light of the overall purpose and structure of the whole statutory scheme." *Id.* at 228-29, "When we look to the plain language of a statute in order to interpret its meaning, we do more than view words or sub-sections in isolation. We derive meaning from context, and this requires reading the relevant statutory provisions as a whole." *Carpenters Health & Welfare Trust Funds v. Robertson (In re Rufener Constr.),* 53 F.3d 1064, 1067 (9th Cir.1995).

Codified sections 1319(c)(1)(A) & 1321(b)(3) of the Clean Water Act work in tandem to criminalize the conduct of which Hanousek was convicted. Section 1319(c)(1)(A) provides that any person who negligently violates 33 U.S.C. ß 1321(b)(3) shall be punished by fine or imprisonment, or both. [FN2] Section 1321(b)(3) proscribes the actual discharge of oil in harmful quantities into navigable waters of the United States, adjoining shore lines or waters of a contiguous zone, as well as other specified activity.

> FN2. 33 U.S.C. ß 1319(c)(1)(A) provides that first-time negligent violators shall be punished by a fine of not less than $2,500 nor more than $25,000 per day of violation, or by imprisonment for not more than one

year, or by both. The same statute provides that second-time negligent violators shall be punished by a fine of not more than $50,000 per day of violation, or by imprisonment of not more than two years, or both.

[4] Neither section defines the term "negligently," nor is that term defined elsewhere in the CWA. In this circumstance, we "start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used." *Russello v. United States,* 464 U.S. 16, 21, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (quoting *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962)). The ordinary meaning of "negligently" is a failure to use such care as a reasonably prudent and careful person would use under similar circumstances. *See Black's Law Dictionary* 1032 (6th ed.1990); *The Random*1121 House College Dictionary* 891 (Rev. ed.1980).

[5] If Congress intended to prescribe a heightened negligence standard, it could have done so explicitly, as it did in 33 U.S.C. ß 1321(b)(7)(D). This section of the CWA provides for increased civil penalties "[i]n any case in which a violation of [33 U.S.C. ß 1321(b)(3) ] was the result of gross negligence or willful misconduct." 33 U.S.C. ß 1321(b)(7)(D). This is significant. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello,* 464 U.S. at 23, 104 S.Ct. 296 (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972)).

[6] Hanousek argues that Congress could not have intended to distinguish "negligently" in 33 U.S.C. ß 1319(c)(1)(A) from "gross negligence" in 33 U.S.C. ß 1321(b)(7)(D) because the phrase "gross negligence" was only recently added to the statute in 1990. *See* Oil Pollution Control Act of 1990, Pub.L. No. 101-380, 104 Stat. 484 (1990). We reject this argument because Congress is presumed to have known of its former legislation and to have passed new laws in view of the provisions of the legislation already enacted. *See United States v. Trident Seafoods Corp.,* 92 F.3d 855, 862 (9th Cir.1996), *cert. denied,* 519 U.S. 1109, 117 S.Ct. 944, 136 L.Ed.2d 833 (1997).

[7] We conclude from the plain language of 33 U.S.C. ß 1319(c)(1)(A) that Congress intended that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a person who acts with ordinary negligence in violating 33 U.S.C. ß 1321(b)(3) may be subject to criminal penalties. [FN3] We next consider Hanousek's argument that, by imposing an ordinary negligence standard for a criminal violation, section 1319(c)(1)(A) violates the due process clause of the Constitution.

> FN3. In light of our conclusion that 33 U.S.C. ß 1319(c)(1)(A) unambiguously permits criminal penalties for ordinary negligence, the rule of lenity has no application. *See Staples v. United States,* 511 U.S. 600, 619 n. 17, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994).

### B. Due Process

[8] We review de novo whether a statute violates a defendant's right to due process. *See United States v. Savinovich,* 845 F.2d 834, 838-39 (9th Cir.1988).

The criminal provisions of the CWA constitute public welfare legislation. *See Weitzenhoff,* 35 F.3d at 1286 ("The criminal provisions of the CWA are clearly designed to protect the public at large from the potentially dire consequences of water pollution, *see* S.Rep. No. 99-50 , 99th Cong., 1st Sess. 29 (1985), and as such fall within the category of public welfare legislation."). Public welfare legislation is designed to protect the public from potentially harmful or injurious items, *see Staples v. United States,* 511 U.S. 600, 607, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), and may render criminal "a type of conduct that a reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health or safety," *see Liparota v. United States,* 471 U.S. 419, 433, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985).

[9] It is well established that a public welfare statute may subject a person to criminal liability for his or her ordinary negligence without violating due process. *See United States v. Balint,* 258 U.S. 250, 252-53, 42 S.Ct. 301, 66 L.Ed. 604 (1922) ("[W]here one deals with others and his mere negligence may be dangerous to them, as in selling diseased food or poison, the policy of the law may, in order to stimulate proper care, require the punishment of the negligent person though he be ignorant of the noxious character of what he sells."); *see also Morissette v. United States,* 342 U.S. 246, 256, 72 S.Ct. 240, 96 L.Ed. 288 (1952) ("The accused, if he

does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities."**1122** ); *United States v. Dotterweich,* 320 U.S. 277, 281, 64 S.Ct. 134, 88 L.Ed. 48 (1943) ("In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger."); *Staples,* 511 U.S. at 607 n. 3, 114 S.Ct. 1793 (reiterating that public welfare statutes may dispense with a "mental element").

Recognizing that our holding in *Weitzenhoff* would defeat his due process argument, Hanousek attempts to distinguish *Weitzenhoff.* The attempt fails. In *Weitzenhoff,* two managers of a sewage treatment plant operating under a National Pollution Discharge Elimination System permit were convicted of knowingly discharging pollutants into a navigable water of the United States, in violation of 33 U.S.C. ß ß 1311(a) & 1319(c)(2). *See Weitzenhoff,* 35 F.3d at 1282-83. In rejecting the defendants' contention that the district court erred by failing to instruct the jury that the government had to prove that the defendants knew their acts violated the permit or the CWA, we held that the criminal provisions of the CWA constitute public welfare legislation and that the government was not required to prove that the defendants knew their conduct violated the law. *See id.* at 1286. We explained that, "[w]here ... dangerous or deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation." *See id.* at 1284 (quoting *United States v. International Minerals & Chem. Corp.,* 402 U.S. 558, 565, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971)).

Hanousek argues that, unlike the defendants in *Weitzenhoff* who were permittees under the CWA, he was simply the roadmaster of the White Pass & Yukon railroad charged with overseeing a rock-quarrying project and was not in a position to know what the law required under the CWA. This is a distinction without a difference. In the context of a public welfare statute, "as long as a defendant knows he is dealing with a dangerous device of a character that places him 'in responsible relation to a public danger,' he should be alerted to the probability of strict regulation." *Staples,* 511 U.S. at 607, 114 S.Ct. 1793 (quoting *Dotterweich,* 320 U.S. at 281, 64 S.Ct.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

134). Although Hanousek was not a permittee under the CWA, he does not dispute that he was aware that a high-pressure petroleum products pipeline owned by Pacific & Arctic's sister company ran close to the surface next to the railroad tracks at 6-mile, and does not argue that he was unaware of the dangers a break or puncture of the pipeline by a piece of heavy machinery would pose. Therefore, Hanousek should have been alerted to the probability of strict regulation. *See id.* FN4

> FN4. Although Hanousek argues that "the harsh penalties that may be imposed for violations of ß 1319(c)(1) are another indication that the law of 'public welfare' offenses should not be applicable," this argument was rejected in *Weitzenhoff. See Weitzenhoff,* 35 F.3d at 1286 n. 7.

[10] In light of our holding in *Weitzenhoff* that the criminal provisions of the CWA constitute public welfare legislation, and the fact that a public welfare statute may impose criminal penalties for ordinary negligent conduct without offending due process, we conclude that section 1319(c)(1)(A) does not violate due process by permitting criminal penalties for ordinary negligent conduct.

C. Vicarious Liability Jury Instruction

[11] Hanousek next contends that the district court erred by failing to instruct the jury that he could not be found vicariously liable for the negligence of Shane Thoe, the Hunz & Hunz backhoe operator.

[12] [13] We review de novo whether a district court's instructions adequately cover a defense theory. *See United States v. Mason,* 902 F.2d 1434, 1438 (9th Cir.1990). We will affirm a district court's refusal to give an otherwise proper theory-of-defense *1123 instruction if the instructions actually given, in their entirety, adequately cover the defense theory. *See id.*

The first of Hanousek's proposed instructions dealing with vicarious liability reads as follows:

You are instructed that Defendant Edward Hanousek is not responsible for and cannot be held criminally liable for any negligent acts or omissions by Shane Thoe or other Hunz & Hunz personnel.

Hanousek also requested a more general instruction that "a person is responsible under the criminal law only for acts he performs or causes to be performed on behalf of a corporation."

The district court rejected Hanousek's proposed instructions without explanation. However, the district court did instruct the jury as follows:

In order for the defendant Ed Hanousek to be found guilty of negligent discharge of oil, the government must prove the following elements beyond a reasonable doubt:

1. The particular defendant caused the discharge of oil;

2. The discharge of oil was into a navigable waterway of the United States;

3. The amount of oil was of a quantity that may be harmful; and

4. The discharge was caused by the negligence of the particular defendant.

We conclude that the district court's instructions adequately explained to the jury that Hanousek could be convicted only on the basis of his own negligent conduct and not on the basis of the negligence of others working at 6-mile. *See United States v. Chen,* 933 F.2d 793, 796 (9th Cir.1991) (stating that we consider the jury instructions as a whole and consider how they will be reasonably understood by the jury). Accordingly, the district court's failure to provide Hanousek's proposed instructions on vicarious liability does not constitute reversible error.

[14] In a related argument, Hanousek argues that the district court erred by allowing the government to strike "foul blows" during closing argument by inviting the jury to convict Hanousek on a theory of vicarious liability. We disagree. In the course of closing argument, the prosecutor stated, "[w]hen Shane Thoe hit that unprotected pipeline and that oil fired out of that pipeline, sprayed up into the air, and got into that Skagway River, these two defendants are guilty of negligent discharging [oil] into the Skagway River." The prosecutor also told the jury that "the buck stops" with Hanousek and M. Paul Taylor, an officer of both Arctic & Pacific and Arctic & Pacific Pipeline, Inc. When read in context, the prosecutor was appropriately arguing to the jury that Hanousek and Taylor failed to adequately protect the pipeline and that both should be held responsible for their negligent conduct. *See United States v. Prantil,* 764 F.2d 548, 555 (9th Cir.1985) (stating that the district court must allow the prosecution the freedom to strike "hard blows" based on the evidence and all fair

Case 1:05-cr-10111-RBC    Document 16-4    Filed 09/20/2005    Page 8 of 10

inferences drawn therefrom).

### D. Causation Jury Instruction

[15] [16] [17] To establish the element of causation, the government must prove beyond a reasonable doubt that the defendant's conduct was both the cause in fact and the proximate cause of the harm. *See United States v. Spinney,* 795 F.2d 1410, 1415 (9th Cir.1986). To prove proximate cause, the government must establish that the harm was a foreseeable result of the conduct. *See United States v. Main,* 113 F.3d 1046, 1049 (9th Cir.1997). In the context of an involuntary manslaughter prosecution, we recently stated:

All of the authorities agree that to be guilty of involuntary manslaughter the harmful result must be within the risk foreseeably created by the accused's conduct; if the physical causation is too remote, the law will not take cognizance of it. "*The same result has been achieved by requiring that the accused's conduct be a substantial factor in causing*\*1124 *the harmful result or that it be the proximate, primary, direct, efficient, or legal cause of such harmful result.*"

*Id.* (quoting Charles E. Torcia, *Wharton's Criminal Law* ß 26 at 148-151 (1993) (emphasis added)).

Hanousek contends that the district court's causation instruction failed to sufficiently inform the jury that, to find Hanousek guilty under 33 U.S.C. ß ß 1319(c)(1)(A) & 1321(b)(3), the accident must have been within the risk foreseeably created by Hanousek's conduct.

The district court gave the jury the following instruction on causation:

In order to prove that a particular defendant caused the negligent discharge of oil as alleged in Count 1 of the indictment, the government must prove beyond a reasonable doubt that:

1. The particular defendant's conduct had a direct and substantial connection to the discharge; and

2. The discharge would not have occurred but for the particular defendant's conduct.

Hanousek did not object to this instruction, but asked that the following instruction, taken directly from *Model Penal Code* ß 2.03(3), also be given:

The element of causation is not established if the actual result is not within the risk of which the particular defendant was aware or should have been aware, unless:

(a) the actual result differs from the probable result only in the respect that a different person or different property is injured or affected or that the probable injury or harm would have been more serious or more extensive than that caused; or

(b) the actual result involves the same kind of injury or harm as the probable result and is not too remote or accidental in its occurrence to have a just bearing on the actor's liability or on the gravity of his offense.

The district court properly declined to provide the jury with the additional instruction Hanousek requested. The causation instruction given by the district court was adequate under *Main.* It required the jury to find that Hanousek's conduct had a "direct and substantial connection" to the discharge of oil. That was sufficient. *See United States v. Warren,* 25 F.3d 890, 895-96 (9th Cir.1994) ("A court may reject portions of a proposed theory of defense that merely rephrase explanations of the law adequately covered elsewhere in the instructions.").

### E. Sufficiency of the Evidence

Although Hanousek did not list sufficiency of the evidence as one of the issues in his briefs, he nevertheless included in his opening and reply briefs an extensive discussion of the evidence and argued that the evidence was insufficient to support his conviction. The government responded to this argument in its brief, and both sides at oral argument argued the issue of whether the evidence was sufficient to support Hanousek's conviction. Because the issue has been presented in this way by the parties, and fully argued, we consider it.

[18] We review the evidence in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See United States v. Lennick,* 18 F.3d 814, 818 (9th Cir.1994).

[19] The government presented evidence at trial that Hanousek was responsible for the rock-quarrying project at 6-mile; that the project involved the use of heavy equipment and machinery along the 1000-foot work site; that Hanousek directed the daily activities of Hunz & Hunz employees and equipment; and that it was customary to protect the pipeline with railroad ties and fill when using heavy equipment in the vicinity of the pipeline. The government also

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

presented evidence that when work initially began in April, 1994, Hunz & Hunz covered an approximately 300-foot section of the pipeline with railroad*1125 ties, sand, and ballast material to protect the pipeline; that after Hanousek took over responsibility for the project in May, 1994, no further sections of the pipeline along the work site were protected; and that the section of the pipeline where the rupture occurred was not protected with railroad ties, sand or ballast. Finally, the government presented evidence that although the rock quarrying work had been completed in the location of the rupture, rocks would sometimes fall off the loaded railroad cars as they proceeded through the completed sections of the work site; that no policy prohibited the use of backhoes off the work platform for other activities; that a backhoe operator ruptured the unprotected pipeline while using a backhoe to remove a rock from the railroad tracks; and that a harmful quantity of oil was discharged into the Skagway River.

The totality of this evidence is sufficient to support Hanousek's conviction for negligently discharging a harmful quantity of oil into a navigable water of the United States, in violation of 33 U.S.C. ß ß 1319(c)(1)(A) & 1321(b)(3).

### F. Sentencing

Based on an offense level of 12 and a criminal history category of I, the district court sentenced Hanousek to 6 months in prison, 6 months in a halfway house, and 6 months of supervised release.

#### 1. Upward Adjustment for Supervisory Role

[20] Hanousek contends that the district court erred by making a two-point upward adjustment under United States Sentencing Guidelines ß 3B1.1(c) based on his role as a supervisor in a criminal activity. We disagree.

Pursuant to U.S.S.G. ß 3B1.1, the district court may make an upward adjustment if the defendant supervised one or more participants. *See United States v. Cyphers,* 130 F.3d 1361, 1363 (9th Cir.1997). A participant is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." *Id.* (quoting U.S.S.G. ß 3B1.1 Application Note 1). Here, the district court did not clearly err by finding that Hanousek was a supervisor because, although the

backhoe operator was not prosecuted, he was nonetheless a participant in the criminal activity, and Hanousek supervised the project at 6-mile.

#### 2. Sentencing Form

Hanousek correctly notes that the sentencing form attached to the final judgment contains "mathematical errors" because it erroneously indicates that the imprisonment range for an offense level of 12 is up to 6 months (the actual range is 10 to 16 months, *see* U.S.S.G. Ch. 5 Pt. A) and that the supervised release range is up to 6 years (the maximum term of supervised release for a misdemeanor (other than a petty offense) is 1 year, *see* 18 U.S.C. ß 3583(b)(3)). However, these errors were clerical and did not play a role in Hanousek's sentencing. At the sentencing hearing, the district court correctly stated that the guideline for an offense level of 12 was 10 to 16 months, and the district court imposed only 6 months of supervised release, well under the one-year maximum.

#### 3. U.S.S.G. ß 5C1.1(d)

United States Sentencing Guideline ß 5C1.1(d) provides:

> If the applicable guideline range is Zone C of the Sentencing Table, the minimum term may be satisfied by-
> (1) a sentence of imprisonment; or
> (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in subsection (e), provided that at least one-half of the minimum term is satisfied by imprisonment.

Hanousek contends that, in imposing sentence, the district court relied on incorrect*1126 information from the probation officer that, under U.S.S.G. ß 5C1.1(d), the entire minimum sentence had to be served as a term of imprisonment. We disagree. The probation officer did originally advise the district court incorrectly that the entire minimum sentence had to be served as a term of imprisonment. However, after the district court questioned the probation officer's reading of the guideline, the probation officer corrected herself by saying, "One-half of the minimum term could be served in imprisonment. I'm sorry." The district court did not rely on incorrect information.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

176 F.3d 1116                                                                                                      Page 10
176 F.3d 1116, 99 Cal. Daily Op. Serv. 1987, 29 Envtl. L. Rep. 21,049, 1999 Daily Journal D.A.R. 2590, 48 ERC
1303
(Cite as: 176 F.3d 1116)

#### 4. Departures

[21] We lack jurisdiction to review the district court's refusal to depart downward from the Sentencing Guidelines. *See United States v. Webster,* 108 F.3d 1156, 1158 (9th Cir.1997). The district court recognized that it had the discretion to make the departures requested by Hanousek, but chose not to do so. *See id.*

#### CONCLUSION

In light of the plain language of 33 U.S.C. ß 1319(c)(1)(A) , we conclude Congress intended that a person who acts with ordinary negligence in violating 33 U.S.C. ß 1321(b)(3) may be subjected to criminal penalties. These sections, as so construed, do not violate due process. Accordingly, the district court properly instructed the jury on ordinary negligence. We also conclude that the district court properly instructed the jury on causation and did not err by refusing to provide the jury with Hanousek's proposed jury instructions on vicarious liability. Finally, the evidence was sufficient to support Hanousek's conviction, and the district court properly imposed its sentence under the Sentencing Guidelines.

AFFIRMED. [FN5]

> FN5. Judge Stagg intends to file a separate dissenting opinion.

C.A.9 (Alaska),1999.
U.S. v. Hanousek
176 F.3d 1116, 99 Cal. Daily Op. Serv. 1987, 29 Envtl. L. Rep. 21,049, 1999 Daily Journal D.A.R. 2590, 48 ERC 1303

Briefs and Other Related Documents (Back to top)

• 1998 WL 34078917 (Appellate Brief) Brief for the United States As Appellee (Jan. 08, 1998) Original Image of this Document (PDF)
• 1997 WL 33487093 (Appellate Brief) Brief of Appellant Edward Hanousek, JR. (Nov. 28, 1997) Original Image of this Document (PDF)
• 97-30185 (Docket) (Jun. 24, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**U.S. Department of Justice**

*Michael J. Sullivan*  MJS
*United States Attorney*
*District of Massachusetts*

*Press Office: (617) 748-3139*

*John Joseph Moakley United States Courthouse, Suite 9200*
*1 Courthouse Way*
*Boston, Massachusetts 02210*
March 29, 2004

## PRESS RELEASE

### BOUCHARD TRANSPORTATION COMPANY AGREES TO PLEAD GUILTY TO CRIMINAL CHARGES AND PAY $10 MILLION FINE RELATED TO APRIL 2003 BUZZARDS BAY OIL SPILL

Boston, MA... United States Attorney Michael J. Sullivan; Michael E. Hubbard, Special Agent in Charge of the Environmental Protection Agency Region I's Criminal Investigation Division; William Schenkelberg, Special Agent in Charge of the Northeast Region of the U.S. Coast Guard Investigative Services; and Thomas J. Healy, Special Agent in Charge of the U.S. Fish and Wildlife Service's Office of Law Enforcement, announced today the filing of a criminal Information charging **BOUCHARD TRANSPORTATION COMPANY** ("BTC"), based in Hicksville, New York, in connection with the April 27, 2003 oil spill in Buzzards Bay. In a plea agreement also filed with the Court today, **BTC** has agreed to plead guilty to both counts in the Information, pay a fine of $10 million, and comply with several remedial measures designed to prevent any future spills by **BTC**.

The Information charges **BTC** with one count of violating the Clean Water Act by negligently causing the discharge of thousands of gallons of oil into Buzzards Bay on April 27, 2003, when the oil barge its tugboat was towing, traveled outside the clearly marked Buzzards Bay channel and struck rocky shoals lying at a depth of 22 feet. **BTC** negligently caused the oil spill because its employee, the mate in charge of the vessel, operated the tugboat in a negligent manner and because **BTC** allowed this individual to remain at the helm of one of its tugboats despite repeated concerns that were raised about his competency.

The second count of the indictment alleges that **BTC** violated the Migratory Bird Treaty Act by killing protected bird species as a result of this oil spill. According to the Information, the April 2003 oil spill killed 450 federally protected birds, necessitated the closure of thousands of acres of shellfish beds in Buzzards Bay, and affected close to 90 miles of Massachusetts' beaches and coastline.

"The U.S. Attorney's Office is committed to protecting the precious natural resources in Buzzards Bay and throughout the Commonwealth," stated U.S. Attorney Sullivan. "This substantial fine of $10 million will provide critically needed funds to enhance conservation efforts. Bouchard Transportation will also be required to comply with strict requirements aimed at preventing this type of environmental tragedy from ever happening again."

### *The Criminal Charges*

As alleged in the Information, the oil spill occurred during the afternoon of April 27, 2003, a bright and clear day. A **BTC** owned and operated tugboat, named the *Evening Tide*, was traveling en route from Philadelphia to Sandwich, Massachusetts. The *Evening Tide* was towing an unpowered barge loaded with over four million gallons of #6 oil, a thick, viscous and adhesive petroleum. All navigational, communications, and steering systems aboard the *Evening Tide* were in good working order. Navigational charts identifying all hazards in the area, which are published by the National Oceanic and Atmospheric Administration, were on-board the *Evening Tide* in paper and electronic form.

According to the Information, while traveling northwards, the *Evening Tide* veered off course as neared the first green buoy marking the beginning of Buzzards Bay channel. The *Evening Tide* and the barge traveled to the west of the first green buoy, the Information alleges, striking a series of rocks. The impact from the collision ripped a twelve foot hole in the bottom of the barge, rupturing one of the barge's ten separate tanks containing oil.

The Information alleges that on the afternoon of April 27, 2003, the Mate was at the helm of the *Evening Tide* (the "Evening Tide Mate") and was the person responsible for navigating and piloting the tugboat and barge during these hours. According to the Information, the *Evening Tide* Mate allowed the boat to drift off course and towards the rocks when he left the wheelhouse for an extended period of time to work at the stern of the tugboat. In leaving the wheelhouse unoccupied, the *Evening Tide* Mate violated the *Evening Tide*'s "Watch Standing Orders" which stated that the Mate or Captain shall, "never leave the bridge unattended while underway."

The Information also alleges that the *Evening Tide* Mate did not monitor radio communications. As a result, the Information alleges, the *Evening Tide* Mate missed efforts by a vessel traveling behind the tugboat to warn the *Evening Tide* Mate that his boat was heading out of the clearly marked Buzzards Bay Channel.

According to the Information, **BTC** was on notice of complaints concerning the competency of the *Evening Tide* Mate. In particular, other captains who had worked with the *Evening Tide* Mate during his eight months with the company had raised questions with BTC's headquarters about whether the *Evening Tide* Mate was sufficiently qualified to be at the helm of a tugboat towing a barge loaded with oil.

### *The Terms of Plea Agreement*

Under the terms of the plea agreement, **BTC** will be required to pay $9 million of the $10 million fine at the time of sentencing. $7 million of the fine proceeds will be deposited in the North American Wetlands Conservation Fund for **BTC**'s violations of the Migratory Bird Treaty Act. This fund is used by the Department of the Interior to finance public-private partnerships aimed at carrying out long term conservation projects that provide and enhance habitat for the migratory birds, fish and wildlife which depend on these fragile areas for their survival. The other $2 million will be directed toward the Oil Spill Liability Trust Fund for **BTC**'s violations of the Clean Water Act. The Oil Spill

2

Liability Trust Fund is administered by the U.S. Coast Guard and used to pay clean up costs and damage claims for oil spills in which the responsible party is unknown.

BTC will also be placed on probation for a period of three years. The final $1 million portion of the criminal fine will be suspended and will be imposed only if BTC fails to comply with the conditions of probation. The conditions of probation imposed through the plea agreement include several remedial measures designed to prevent this type of oil spill from occurring again, including the following:

- BTC will be required to hire a local pilot, experienced with the waters of Buzzards Bay, to guide BTC tugboats and barges through Buzzards Bay;

- BTC will adhere to an extensive compliance program designed to address various operational deficiencies pertinent to the oil spill, including the hiring process for new mates, the training program for new mates, and BTC's evaluation system for mates and captains;

- all BTC vessels will be required to maintain radio communications with other vessel traffic at all times; and

- BTC will be required to place a crew member inside the wheelhouse at all times.

### *The Investigation*

As a condition of its plea agreement with the United States, BTC has also agreed to disclose to the government the results of its internal investigation into this oil spill.

The investigation is continuing.

The investigation is being conducted by the Environmental Protection Agency's Criminal Investigation Division, the U.S. Coast Guard Investigative Services, and the U.S. Fish and Wildlife Service's Office of Law Enforcement. The U.S. Attorney would also like to recognize the U.S. Secret Service and the Massachusetts Environmental Police for their assistance to investigators on the case. This case is being prosecuted by Assistant U.S. Attorneys Joshua S. Levy and Nadine Pellegrini, along with the Environmental Protection Agency's Senior Criminal Enforcement Counsel, Peter Kenyon. The federal investigation also received substantial assistance from Assistant Attorney General Paul Molloy of the Massachusetts Attorney General's Environmental Crimes Strike Force.

Press Contact: Samantha Martin, (617) 748-3139



**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*                     *United States Courthouse, Suite 9200*
                                                      *1 Courthouse Way*
                                                      *Boston, Massachusetts 02210*

March 10, 2004

Ronald W. Zdrojeski, Esq.
LeBoeuf, Lamb, Greene & MacRae
225 Asylum Street, 13th Floor
Hartford, CT   06103

Thomas M. Russo, Esq.
Freehill, Hogan & Maher
80 Pine Street
New York, NY   10005

                Re:     United States v. Bouchard Transportation Company

Dear Counsel:

        This letter sets forth the agreement entered into between the United States Attorney for the
District of Massachusetts (the "United States Attorney") and your client, Bouchard Transportation
Company ("BTC" or the "Defendant"), in the above-captioned matter.  The agreement is as follows:

        1.      Guilty Plea

        On or before April 2, 2004, or such date as the Court may determine, Defendant shall waive
its right to indictment and plead guilty to the Information to be filed in the District of Massachusetts
in substantially the form attached, charging it with (i) one count of illegally discharging oil into the
navigable waters of the United States in violation of the Clean Water Act, Title 33 U.S.C. §§
1319(c)(1), 1321(b)(3) and (ii) one count of killing migratory birds in violation of the Migratory Bird
Treaty Act, Title 16 U.S.C. §§ 703, 707.

        2.      Penalties

        Defendant understands and agrees that the statutory maximum penalties for the counts to
which it is pleading guilty are as follows:

A.    Clean Water Act
  -       two times the pecuniary loss caused by the offense pursuant to 18 U.S.C. §3571(d);
  -       five years probation;
  -       restitution; and
  -       $125 special assessment pursuant to 18 U.S.C. §3013(a)(1)(B)(iii).

B.    Migratory Bird Treaty Act
  -       two times the pecuniary loss caused by the offense pursuant to 18 U.S.C. §3571(d);
  -       five years probation;
  -       restitution; and
  -       $50 special assessment pursuant to 18 U.S.C. §3013(a)(1)(B)(ii).

3.    Sentencing Guidelines

The United States Attorney and Defendant agree that the version of United States Sentencing Guidelines ("U.S.S.G.") incorporating guideline amendments through November 1, 2002 shall cover these offenses to the limited extent that the guidelines apply in this context. The United States Attorney and the Defendant further agree that pursuant to § 8C2.1 (commentary) and § 8C2.10 of the United States Sentencing Guidelines, which pertain to the sentencing of organizations, the Sentencing Guidelines do not determine the fine range in environmental cases, but rather leave such determination to the sound discretion of the Court in accordance with 18 U.S.C. §§3553, 3571 and 3572.

4.    Corporate Authorization

Within two weeks of the execution of this plea agreement, BTC will provide to the United States Attorney and to the Court written evidence, in the form of a notarized resolution of its Board of Directors, certifying that Defendant is authorized to waive its right to indictment, to plead guilty to the Information in this case, and to enter into and comply with all provisions of this agreement. The resolution shall further certify that an identified individual is authorized to take these actions and that all corporate formalities, including, but not limited to, approval by Defendant's directors, required for such authorization have been observed.

Defendant agrees that Ronald W. Zdrojeski or Thomas M. Russo, as attorneys for BTC, and pursuant to a duly authorized power of attorney for the Defendant, will be authorized to appear on its behalf, to enter its guilty plea and to represent it for imposition of its sentence.

2

5.     Agreed Disposition

A.     **Agreed upon Sentence**

The United States Attorney and Defendant agree, pursuant to Fed. R. Crim. P. 11(c)(1)(C), that the following is the appropriate disposition of this matter:

  i.     $10,000,000 fine to be paid as specified below in paragraph 5.B;

  ii.    a three year term of probation, during which the Defendant must comply with the special conditions of probation set forth in paragraph 8 below; and

  iii.   a $175 special assessment.

B.     **Method of Payment**

Upon imposition of the sentence, the parties agree that $9 million of the fine and the special assessments, totaling $9,000,175, be payable forthwith. $1 million out of the total fine will be suspended, provided that if BTC fails, in a material manner, to implement the special conditions of probation set forth in section 8 below, the Court may order the defendant to pay the suspended portion of this fine.

Defendant agrees to convey the entire amount of the fines and special assessments due forthwith – $9,000,175 – by wire transfer to the Clerk of the United States District Court for the District of Massachusetts. Defendant agrees to make this payment within two business days following the imposition of the sentence.

No amount of the fine shall reduce the Defendant's civil liability to any person or entity, including any federal, state or local government agency. The parties agree that $2,000,000 of the fine shall be imposed for violation of the Oil Pollution Control Act of 1990, 33 U.S.C. §1321(b)(3), and by operation of law, specifically, 33 U.S.C. §1321(s), that amount shall be directed to the Oil Spill Liability Trust Fund. The parties further agree that $7,000,000 of the fine shall be imposed for violation of the Migratory Bird Treaty Act, 16 U.S.C. §§703, 707(a), and by operation of law, specifically, 16 U.S.C. §4406(b), that amount shall be directed to the Department of the Interior to carry out approved wetlands conservation projects.

6.     Conditions Precedent

The participation of the United States Attorney in the joint agreement set forth in paragraph 5 of this agreement is conditional upon Defendant's performance of the following obligations:

A.     Defendant shall provide full and truthful cooperation to the United States Attorney as set forth in paragraph 9 of this agreement;

3

B.      No later than two business days prior to sentencing, as scheduled by
the Court, Defendant shall notify the United States Attorney that
Defendant's counsel is in possession of $9,000,175 in its client funds
account with which to pay Defendant's fine and mandatory special
assessments as provided in paragraph 5;

C.      BTC shall comply with the remedial measures set forth in paragraph
8 of this agreement; and

If Defendant fails to comply with these conditions prior to sentencing, the United States
Attorney shall be free to recommend any sentence, including fine, it deems appropriate.

7.      Mandatory Special Assessment

Defendant agrees to pay the mandatory special assessments, totaling $175, to the Clerk of
the Court of the United States District Court for the District of Massachusetts within two business
days after the date of sentencing.

8.      Special Conditions of Probation – Remedial Measures

As stated in the paragraph 5 above, the Defendant shall be placed on probation for a period
of three years. During this period of time, the Defendant will be required to comply with the
conditions of probation set forth below. These special conditions of probation are in addition to, and
do not relieve the defendant of complying with, all existing applicable federal laws and regulations.

A.      *Operational Measures*

i.      *Buzzards Bay Pilotage Requirement:* BTC shall hire a pilot for all
trips (north or south) in which a tugboat owned or operated by BTC
is traveling with a barge (hereinafter "BTC tugboat/barge unit") into
Buzzards Bay, as defined as the body of water between the Cape Cod
Canal and the Buzzards Bay Entrance Light [41-23-47.5 North and
71-02-00.6 West] (hereinafter "Buzzards Bay Entrance Light").

a.      In the event a pilot can not board a north-
bound tugboat/barge unit prior to the Buzzards Bay
Entrance Light, the BTC tugboat/barge unit shall: (1)
establish and maintain radio communications with a
pilot; and (2) establish and maintain radar contact
with a pilot prior to proceeding into Buzzards Bay,
until a pilot can board the BTC tugboat at the New
Bedford pilot station. If a BTC tugboat/barge unit is
unable to comply with the conditions set forth in this

subparagraph, it shall notify the Captain of the Port Providence prior to entering Buzzards Bay, as defined above. The requirements set forth in this subparagraph shall not apply to: (1) double hull barges; or (2) empty barges carrying only "clingage." Nothing in this subparagraph shall alter the existing authority of a captain of a BTC tugboat to operate that vessel.

b. In the event that a south-bound BTC tugboat/barge unit can not allow a pilot to disembark after the Buzzards Bay Entrance Light, the BTC tugboat/barge unit shall allow the pilot to disembark at the New Bedford pilot station. Once the pilot has disembarked, the BTC tugboat/barge unit shall: (1) establish and maintain radio communications with a pilot; (2) establish and maintain radar contact with a pilot until it exits Buzzards Bay, as defined above. If a BTC tugboat/barge unit is unable to comply with the conditions set forth in this subparagraph, it shall notify the Captain of the Port Providence, prior to entering Buzzards Bay, as defined above. The requirements set forth in this subparagraph shall not apply to: (1) double hull barges; or (2) empty barges carrying only "clingage." Nothing in this subparagraph shall alter the existing authority of a captain of a BTC tugboat to operate that vessel.

ii.    *Maintenance of Radio Contact*: At all times when a tugboat/barge unit operated by BTC is underway, the individual in charge of the watch will be required to monitor radio communications, via the wheelhouse radio or through the use of a hand-held radio, consistent with applicable federal law and regulations;

iii.   *Manning of Wheelhouse*: At all times when a tugboat/barge unit operated by BTC is underway, the individual in charge of the watch will not leave the wheelhouse without designating another crew member to be present in the wheelhouse;

iv.    *Navigational Software Record Compliance*: BTC will operate all navigational software in a manner that ensures that a record is maintained for ten (10) days of the routes actually traveled by BTC tugboat/barge units. Within seven days of the sentencing hearing,

BTC will submit to the Probation Department and the United States Attorney's Office a list of all BTC vessels that do not have equipment sufficient to comply with this condition and a reasonable schedule for completing the necessary upgrades to bring those vessels into compliance. The requirements set forth in this subparagraph shall not apply to (1) double hull barges; or (2) empty barges carrying only "clingage."

B.    *Compliance Program – Independent Consultant*

BTC agrees to establish and maintain an effective compliance program to ensure compliance with the aforementioned special conditions of probation and with the operational areas set forth below in subparagraph ii. The compliance program will include the following parameters:

i.    BTC agrees that it will retain, at its own expense, the services of an independent consultant. This individual will be responsible for designing and administering this compliance program. The Defendant agrees to give the consultant full access to all BTC records, employees, facilities and vessels necessary to make a meaningful evaluation of the Defendant's current operations.

ii.    BTC will retain the consultant within 7 days from the execution of this agreement and submit the curriculum vitae of the independent consultant to the United States Attorney's Office. The consultant must be approved by the United States Attorney's Office. Within 14 days of when the consultant is approved, the Defendant shall submit to the United States Attorney's Office and the United States Coast Guard, a copy of the contract between the consultant and the Defendant which details the scope of the audit to be performed, and a schedule of interim and final deadlines. The audit shall address the following areas:

(1) hiring of mates and captain, including the due diligence performed during the hiring process concerning an applicant's licensing and recency;
(2) performance evaluations for mates and captains, including new hires;
(3) the tug and barge watch-standing requirements, radio communications, recency requirements, look-out requirements, manning requirements, proper use of computerized navigational aids and paper charts, preparation of proper voyage plans, and the use of computerized alarm systems to detect deviations from plotted courses;

6

>           (4) oil spill prevention, spill notification and spill
>           response.

> The scope of the audit must be approved by the United States Attorney's
> Office and the United States Coast Guard and the Defendant agrees to adopt
> any reasonable modifications proposed by the United States Attorney's Office
> or the United States Coast Guard.

iii.    The consultant will follow generally accepted environmental auditing
        techniques, procedures and policies in designing, implementing and
        executing the audit, including the reporting of deficiencies and corrective
        measures;

iv.     The consultant will prepare a draft report of its findings and
        recommendations which will be furnished to the Probation Department, the
        United States Attorney's Office and the United States Coast Guard at the
        same time it is given to the Defendant. This draft report will be submitted
        45 days prior to the sentencing proceeding;

v.      The consultant will prepare a final report of its findings and
        recommendations which the Defendant will furnish to the Probation
        Department, the United States Attorney's Office and the United States Coast
        Guard 21 days prior to the sentencing proceeding;

vi.     The Defendant will submit a written response to the Probation Office, the
        United States Attorney's Office and the United States Coast Guard no later
        than 7 days after receiving the consultant's final written report. The response
        will specify what actions the Defendant will take to correct any noted
        deficiencies and regulatory violations;

vii.    The independent consultant will submit annual reports to the Probation
        Department, the United States Attorney's Office and the United States Coast
        Guard detailing the implementation of the compliance program. The
        responsibilities of the independent consultant shall terminate when the period
        of probation is completed or at an earlier time if the Court, upon motion of
        either party, determines that the independent consultant's services are no
        longer needed.

C.      **Corporate Compliance Officer**

        BTC agrees to appoint a compliance officer for BTC, who is experienced in environmental
regulations and compliance, and who will be responsible for all federal and state environmental
regulatory compliance. At or before the time of sentencing, BTC will provide the Probation

Department, the United States Attorney's Office and the United States Coast Guard with the name and *curriculum vitae* of the individual who has been designated as the corporate compliance officer.

### D.    The Natural Resource Damage Assessment

BTC will cooperate fully with federal, state and local officials in the Natural Resource Damage Assessment process set forth in the Oil Pollution Control Act of 1990, 33 U.S.C. §2701, *et seq*. BTC will not withdraw its acknowledgment that it is the Responsible Party as it relates to the oil spill in Buzzards Bay involving BTC that occurred on April 27, 2003 (hereinafter the "Buzzards Bay Oil Spill"), for purposes of this Natural Resource Damage Assessment process.

### 9.    Cooperation with Law Enforcement

Defendant agrees to cooperate truthfully and completely with the United States Attorney in its investigation of possible violations of federal and state law and in any trial or other proceedings arising out of the investigation of the Buzzards Bay Oil Spill.

A.    Defendant understands and agrees that its cooperation obligations will require it to do the following:

   i.    provide access to original documents and records;

   ii.    require that, upon request and reasonable notice by the United States Attorney, Defendant's directors, officers and employees make themselves available for interviews by law enforcement agents and for attendance at legal and judicial proceedings, including grand jury sessions, trials and other court hearings; and

   iii.    waive any claim of work product privilege with respect to the information disclosed to or obtained by Defendant's counsel through employee and non-employee witness interviews concerning any aspect of the Buzzards Bay Oil Spill.

B.    Defendant further understands and agrees that its cooperation obligations will require it to do the following, within 14 days of the entry of its plea, with respect to work product prepared by BTC's counsel:

   i.    provide all notes and memoranda of interviews compiled and prepared by its counsel of interviews of Defendant's employees as part of its internal investigation into the Buzzards Bay Oil Spill;

   ii.    provide all notes and memoranda of interviews compiled and prepared by their counsel of interviews with individuals who are not

directors, officers or employees of the Defendant as part of its internal investigation into the Buzzards Bay Oil Spill;

iii.    make available, upon request and reasonable notice by the United States Attorney, Defendant's counsel who conducted or participated in interviews of any individuals identified in subparagraphs 10(B)(i) and (B)(ii) above to provide information concerning the substance of any such interviews.

As limited to such materials, Defendant and its counsel will provide a complete and full waiver of the attorney-client privilege and the work-product privilege, except as to those portions of materials containing the mental impressions and opinions of their counsel. Defendant agrees that only portions of materials containing the mental impressions and opinions of their counsel will be redacted from the materials described in this paragraph. The United States Attorney agrees that production of such materials will not be construed as a general waiver of the attorney-client privilege and/or work product privilege as to any communications or materials beyond those referred to in paragraphs 10(B)(i) and (ii) and (iii) above.

C.    If Defendant complies with all the terms of this agreement, the United States Attorney will, upon request of Defendant, advise the Court and any federal, state or local government agency, including licensing agencies or authorities, of the nature and extent of any cooperation provided by Defendant.

10.    Criminal Liability

Provided that the Defendant complies with the terms of this agreement, the United States Attorney agrees not to seek additional criminal prosecution against Defendant in connection with the Buzzards Bay Oil Spill.

11.    Probation Office Not Bound By Agreement

The sentencing disposition agreed upon by the parties is not binding upon the United States Probation Office. Defendant's plea will be tendered pursuant to Fed. R. Crim. P. 11(c)(1)(C). Defendant cannot withdraw its plea of guilty unless the sentencing judge rejects the plea agreement. If the sentencing judge rejects the plea agreement, this agreement shall be null and void at the option of either the United States Attorney or the Defendant. In this regard the Defendant hereby waives any defense to any charges which it might otherwise have under any statute of limitations or the Speedy Trial Act.

12.    Information For Presentence Report

Defendant agrees to provide all information requested by the United States Probation Office

9

concerning its assets, income and financial condition.

13. Civil Liability

By entering into this agreement, the United States Attorney does not compromise any civil liability, including but not limited to any tax liability or any liability under the Natural Resources Damage Assessment, which Defendant may have incurred or may incur as a result of its conduct and its plea of guilty to the charges specified in paragraph 1 of this agreement. BTC acknowledges and understands that its convictions pursuant to this plea agreement will trigger the debarment from government contracts and grants provisions of 33 U.S.C. §1368 and 40 C.F.R. Part 33.

14. Restitution

The Oil Pollution Control Act of 1990, 33 U.S.C. §2701, *et seq.*, sets forth a comprehensive process for assessing and restoring natural resource damages, as well as other forms of damages that result from oil spills. BTC acknowledges and concedes that it is the Responsible Party for purposes of the damage assessment conducted pursuant to this statute. The United States Attorney and the Defendant further recognize and acknowledge that the process for determining such damages is underway with respect to the Buzzards Bay Oil Spill. In light of the availability of that forum to determine the value of the loss to the victims of the Buzzards Bay Oil Spill, as well as the complexity of the loss valuation issues, the United States Attorney and the Defendant agree that the complication and prolongation of the sentencing process that would result from fashioning an appropriate restitution order outweigh the need to provide for restitution to the victims in the context of this criminal case. Defendant agrees that nothing in this paragraph shall be construed to eliminate or reduce Defendant's civil liability to any federal, state, local or private party. Defendant further agrees that nothing in this plea agreement shall be construed to eliminate or reduce Defendant's obligations arising out of the requirements for damage restorations or claims contained in the Oil Pollution Act of 1990, 33 U.S.C. §2701, *et seq.* in connection with the Buzzards Bay Oil Spill. Defendant further agrees that nothing in this paragraph shall be construed to eliminate or reduce its liability or obligation for the restoration, rehabilitation or replacement of the natural resources damaged, destroyed or injured as a result of the Buzzards Bay Oil Spill.

15. Withdrawal of Plea Agreement

Should Defendant's guilty plea not be accepted by the Court for whatever reason, or later be withdrawn on motion of Defendant, this agreement shall be null and void at the option of the United States Attorney.

16. Breach of Agreement

If the United States Attorney determines that Defendant has failed materially to comply with any provision of this agreement, or has committed any crime during the pendency of this agreement, the United States Attorney may, at his sole option, be released from his commitments under this

agreement in their entirety by notifying Defendant, through counsel or otherwise, in writing. The United States Attorney may also pursue all remedies available to him under the law, irrespective of whether he elects to be released from his commitments under this agreement. Defendant recognizes that no such breach by it of any obligation under this agreement shall give rise to grounds for withdrawal of its guilty plea. Defendant understands that should any such breach of this agreement occur, the United States Attorney will have the right to use against Defendant before any grand jury, at any trial, hearing or for sentencing purposes, any statements made by its employees and agents, and any information, materials, documents or objects provided by Defendant to the United States Attorney pursuant to this agreement without any limitation. In this regard, Defendant hereby waives any defense to any charges which it might otherwise have under any statute of limitations or the Speedy Trial Act.

17.    Who Is Bound By Agreement

This agreement is limited to the United States Attorney for the District of Massachusetts and cannot and does not bind the Attorney General of the United States or any other federal, state or local prosecutive authorities.

18.    Complete Agreement

This agreement is the complete and only agreement between the parties. No promises, agreements or conditions have been entered into other than those set forth in this letter. This agreement supersedes prior understandings, if any, of the parties, whether written or oral. This agreement cannot be modified other than in a written memorandum signed by the parties or on the record in court.

If this letter accurately reflects the agreement entered into between the United States Attorney and Defendant, please sign the Acknowledgment of Plea Agreement below, and affix Defendant's corporate seal. Please also have the signatures of the corporate signatories notarized. In addition, please provide a copy of requisite authorization to enter into this agreement, by Defendant's directors (the original to be provided to the Court). Return the original of this letter to Assistant United States Attorney Joshua S. Levy.

Sincerely,

MICHAEL J. SULLIVAN
United States Attorney

By:

JAMES B. FARMER
Assistant U.S. Attorney
Chief, Criminal Division

STEPHEN P. HEYMANN
Assistant U.S. Attorney
Deputy Chief,
Criminal Division

JOSHUA S. LEVY
Assistant U.S. Attorney

NADINE PELLEGRINI
Assistant U.S. Attorney

PETER KENYON
Senior Criminal Enforcement Counsel
Environmental Protection Agency

12

ACKNOWLEDGMENT OF PLEA AGREEMENT
Bouchard Transportation Company

I have read this letter of agreement in its entirety, and have discussed it with the directors of Bouchard Transportation Company and with its attorneys. I hereby represent that I am an officer of Defendant corporation and that I am duly authorized to enter into this agreement. I hereby acknowledge that this letter of agreement fully sets forth the agreement of Bouchard Transportation Company with the United States Attorney for the District of Massachusetts. I further state that there have been no additional promises or representations made to or for the benefit of Bouchard Transportation Company by any officials of the United States Attorney in connection with this matter.

For Defendant
Bouchard Transportation Company

Date:  3/25/04

Corporate Seal:

Notary Acknowledgment and Seal:

VICTOR PAUL CORSO
Notary Public, State of New York
No. 02CO4984194
Qualified in Suffolk County
Certificate Filed in New York County
Commission Expires July 18,
November 29, 2005

I certify that this plea agreement letter has been reviewed by a duly authorized official of Bouchard Transportation Corporation and that he/she understands its terms.

Date: March 26, 2004
Ronald W. Zdrojeski, Esq.
Attorney for Bouchard Transportation Corporation

Date: March 26, 2004
Thomas M. Russo
Attorney for Bouchard Transportation Corporation

13